IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IVANIA AMADOR *et al.*,

    *Plaintiffs*,

v.

                                 Civil Action No. ELH-20-1102

STEVEN MNUCHIN *et al.*,

    *Defendants*.

## MEMORANDUM OPINION

This case concerns a constitutional challenge to a provision of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. 116-136, 134 Stat. 281 (2020), codified at 26 U.S.C. § 6428(g)(1)(B). The provision excludes an otherwise eligible individual from receiving emergency cash assistance in the midst of the COVID-19 pandemic if his or her spouse is an undocumented immigrant.

The plaintiffs are sixteen United States citizens whose spouses lack legal status. ECF 31 ("Amended Complaint"), ¶¶ 4-19. They have sued defendants Steven T. Mnuchin, the Secretary of the U.S. Department of the Treasury; Charles Rettig, the Commissioner of the Internal Revenue Service (the "IRS"); the U.S. Department of the Treasury; and the IRS (collectively, the "Government"). *Id.* ¶¶ 20-23. Plaintiffs allege that 26 U.S.C. § 6428(g)(1)(B) violates the First and Fifth Amendments to the Constitution. *Id.* ¶¶ 75-96.[1] They seek a declaration that § 6428(g)(1)(B) is unconstitutional and an order enjoining its enforcement.

---

[1] Plaintiffs cite to the "Equal Protection Clause" of the Fifth Amendment. *See* ECF 31 at 19. However, no such clause exists in the Fifth Amendment. Rather, § 1 of the Fourteenth Amendment contains such a clause. Nonetheless, this mistake is of no moment because, as discussed below, equal protection principles apply to the federal government through the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

On May 15, 2020, the Court held a telephone conference with counsel.  Counsel agreed to provide the Court with abbreviated submissions outlining the bases for a proposed motion to dismiss, the grounds in opposition, and a reply.  ECF 30.[2]  The truncated briefing was necessitated by the challenges resulting from the COVID-19 pandemic, as pertinent to this and many other cases.  I advised the parties that, if the Court were to resolve any issues raised in the submissions without further briefing, those issues would be deemed preserved for appeal, as if they had been raised in a more detailed motion to dismiss under Fed. R. Civ. P. 12(b).  *See id.*  And, the parties may reassert and amplify their arguments in connection with a motion for summary judgment and the opposition to it.

Accordingly, I shall construe defendants' submission as a motion to dismiss.  ECF 32 (the "Motion").  Defendants assert that the suit is subject to dismissal based on sovereign immunity, standing, and failure to state a valid claim.  Plaintiffs oppose the Motion (ECF 36) and the Government has replied.  ECF 41.  In addition, the Federation for American Immigration Reform ("FAIR") filed an amicus brief.  ECF 38.  The Government (ECF 40) and plaintiffs (ECF 42) have both submitted letters disputing FAIR's contentions.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

---

[2] The Government's initial letter and plaintiffs' opposition were not to exceed ten pages, and the reply was not to exceed four pages.

# I.      Factual Background[3]

The COVID-19 virus has triggered the worst public health crisis the country has experienced since 1918.[4]   The novel coronavirus is a highly contagious and sometimes fatal respiratory illness.[5]   It first appeared in Wuhan, China in December 2019; in a matter of months, COVID-19 spread to every corner of the globe.[6]   On March 12, 2020, the World Health Organization declared COVID-19 a global pandemic.   *See* WHO Director-General's opening remarks at the mission briefing on COVID-19, WORLD HEALTH ORG. (March 12, 2020), https://bit.ly/2XWdodD.   The next day, President Trump declared a national emergency.   *See* The

---

[3] Given the posture of the case, I must assume the truth of all factual allegations in the Complaint.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).  However, the Court can "take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

I note that on June 19, 2020, Judge Paul W. Grimm issued a Memorandum Opinion and Order denying the Government's motion to dismiss a related lawsuit challenging § 6428(g).  *See R.V. v. Mnuchin*, PWG-20-1148, 2020 WL 3402300, at *8 (D. Md. June 19, 2020).  In that case, the plaintiffs are seven United States citizen children and their parents.  The children were denied cash assistance under the CARES Act because one or both of their parents are undocumented.  They allege, *inter alia*, that § 6428(g) discriminates on the basis of their parents' alienage, in violation of equal protection.  *See id.* at *1.  In addition to injunctive relief, they seek an award of the cash assistance payments.  Judge Grimm rejected the Government's arguments for dismissal predicated on sovereign immunity, standing, and failure to state a claim.

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

[5] Fatality rates increase with age and underlying health conditions, such as cardiovascular disease, respiratory disease, diabetes, and immune compromise.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (July 17, 2020), https://bit.ly/2WBcB16.

[6] As of August 5, 2020, the coronavirus has infected over 18 million individuals world-wide and caused over 700,000 deaths. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Aug. 5, 2020).

White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://bit.ly/3flFu8i.

Because there is currently no effective treatment for COVID-19, the Centers for Disease and Control has implored citizens to practice "social distancing" in order to abate the spread of the virus. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba.  To that end, in the spring of 2020 nearly every state in the country issued mandatory stay-at-home orders, directing residents to remain at home except to conduct essential activities.  *See Sarah Mervosh et al.*, *See Which States Are Reopening and Which Are Still Shut Down*, N.Y. TIMES (May 15, 2020), https://nyti.ms/2Z6Fm7F.  As a result, life as we know it came to a halt; schools, restaurants, bars, shopping malls, retail stores, and houses of worship all shuttered for a significant period of time.

Social distancing measures, although necessary to thwart the spread of the virus, had tremendous economic consequences.  Personal consumption in March 2020 plummeted by a record 7.5 percent.  *See Personal Income and Outlays: March 2020*, U.S. BUREAU OF ECON. ANALYSIS (Apr. 30, 2020 8:30 a.m.), https://bit.ly/3d8wUZ2.  In the month of April 2020 alone, more than 20 million Americans lost their jobs, driving the unemployment rate to 14.7 percent, the largest single-month increase ever recorded.  *See Economic News Release*, U.S. BUREAU OF LAB. STAT. (May 8, 2020 8:30 a.m. EST), https://bit.ly/2UGiOYr.  These losses reached people from all stations of life: the leisure and hospitality industry lost 7.7 million jobs (nearly half the industry), while the education and health services industry, the professional and business services industry, and the retail trade industry each shed more than 2 million jobs.  *Id.*

On March 27, 2020, Congress passed and President Trump signed the CARES Act, Pub. L. 116-136, 134 Stat. 281 (2020), a $2.2 trillion stimulus package designed to alleviate the

incredible economic devastation wrought by the pandemic.  Relevant here, § 2201(a) of the CARES Act, codified at 26 U.S.C. § 6428, harnessed the federal tax infrastructure to provide emergency financial assistance to Americans in the form of an advanced refundable tax credit. Defendants refer to the credit as an "economic impact payment."  *See Economic Impact Payment Information Center*, INTERNAL REVENUE SERV. (July 15, 2020), https://bit.ly/2WEtZBO; *The CARES Act Provides Assistance to Workers and their Families*, U.S. DEP'T OF THE TREASURY, https://bit.ly/39gPGwE (last accessed July 20, 2020).

Specifically, § 6428(a) provides that an "eligible individual . . . shall be allowed" a "credit against the tax imposed" for the 2020 tax year in the amount of $1,200, or $2,400 "in the case of eligible individuals filing a joint return."  26 U.S.C. § 6428(a)(1).[7]  An eligible individual also receives an additional $500 credit for each qualifying child under the age of seventeen.  *Id.* § 6428(a)(2).  Receipt of this money "shall be treated" as a refundable credit, *id.* § 6428(b), meaning that the impact payment is not taxed even if it exceeds the recipient's tax liability.

The CARES Act directs the Secretary of the Treasury to issue the credit "as rapidly as possibly" and specifies that no impact payment "shall be made or allowed" after December 31, 2020.  *Id.* § 6428(f)(3)(A).  As of April 24, 2020, the IRS reported that it had disbursed nearly $160 billion in impact payments to over 89.5 million Americans.  *See Treasury, IRS Deliver 89.5 Million Economic Impact Payments in First Three Weeks, Release State-By-State Economic Impact Payment Figures*, INTERNAL REVENUE SERVS. (Apr. 28, 2020), https://bit.ly/30LGAUO.

---

[7] The amount of the credit decreases above certain adjusted gross income ("AGI") levels, depending on the individual's filing status.  The phaseout begins at an AGI of $150,000 for joint filers, $112,500 for head-of-household filers, and $75,000 for those filing single or married filing separately.  26 U.S.C. § 6428(c).

Receipt of the impact payment is contingent on the satisfaction of several prerequisites. First, the individual's income must fall below a statutory threshold. 26 U.S.C. § 6428(c). Second, in order to qualify as an "eligible individual," the recipient cannot be either a "nonresident alien individual" or a dependent child. *Id.* § 6428(d). An individual can demonstrate compliance with these requirements in the 2020 calendar year using either a 2018 or 2019 tax return or in the 2021 calendar year based on a 2020 tax return. *See id.* § 6428(a), (f).

Section 6428(g) contains additional limitations. Relevant here, § 6428(g)(1) provides:

**(g) Identification number requirement**

(1) **In general**—No credit shall be allowed under subsection (a) to an eligible individual who does not include on the return of tax for the taxable year—

> (A) such individual's valid identification number,
>
> (B) in the case of a joint return, the valid identification number of such individual's spouse . . . .

In turn, § 6428(g)(2) defines "valid identification number" as a Social Security Number ("SSN") issued to a citizen of the United States, a lawful permanent resident ("LPR"), or a noncitizen who is not a LPR but who has work authorization. *See id.* § 6428(g)(2) (defining SSN in reference to 26 U.S.C. 24(h)(7)). This requirement is significant because undocumented immigrants are not eligible to obtain an SSN; they use an Individual Taxpayer Identification Number ("ITIN") issued to them by the IRS to file a tax return. *See* ECF 31, ¶ 39; *see also* 20 C.F.R. § 422.104(a) (delineating the eligibility requirements to obtain a SSN). Consequently, §§ 6428(g)(1)(B) and (g)(2) operate in tandem to exclude otherwise eligible individuals and their children from receipt of impact payments if they file a joint tax return and if their spouse is undocumented and therefore lacks a SSN.

According to plaintiffs, this result is no accident.  ECF 31, ¶ 45.  They point out that during the floor debates of the CARES Act, Congressman TJ Cox of California highlighted what he called the CARES Act's "'glaring shortcomings,'" which included that it "'punishes mixed-status households and denies some American citizens benefits they deserve.'"  *Id.* (quoting 166 Cong. Rec. H1841 (daily ed. Mar. 27, 2020)).  Moreover, although the original Senate version of the CARES Act required that all married joint filers possess SSNs in order to be eligible for impact payments, the Senate inserted an exception permitting families to receive the credit if one spouse lacked a SSN, so long as the other spouse was a member of the Armed Forces, which is codified at 26 U.S.C. § 6428(g)(3).  Plaintiffs claim that this exception "demonstrates that Congress was aware that impact payments would be generally unavailable to qualified individuals who are married to and jointly file their taxes with non-citizens who lack a [SSN]."  ECF 31, ¶ 49.

As noted, plaintiffs are sixteen American citizens.  *Id.* ¶¶ 4-19.  Some have citizen children, and all are married to individuals who use an ITIN to file a federal tax return.  *Id.*  Plaintiffs allege that they filed a joint federal tax return that included their SSN, the SSNs of any eligible children, and their spouse's ITIN.  *See id.* ¶ 41.  However, plaintiffs claim that they did not receive an impact payment.  *See id.* ¶¶ 42-43.  According to plaintiffs, but for their spouse's lack of a SSN, they are otherwise eligible to receive an impact payment.  *See id.*  Thus, they claim that § 6428(g)(1)(B) is the sole reason that they have not received the credit.  *See id.*

The Amended Complaint contains three causes of action.  First, plaintiffs allege that § 6428(g)(1)(B) "intentionally and substantially infringes upon" their "fundamental right to marriage and to choose how to define their families," in violation of the Due Process Clause of the Fifth Amendment.  *Id.* ¶ 79.  Second, plaintiffs assert that § 6428(g)(1)(B) violates their "right to freedom of speech and association guaranteed by the First Amendment by denying them recovery

payments because they express their lawful marriage and commitment to, and association with, their spouses in their most recent jointly-filed federal tax returns." *Id.* ¶ 85. Third, plaintiffs claim that § 6428(g)(1)(B) violates the equal protection component of the Fifth Amendment because it treats them "differently than other married couples simply because their spouses lack social security numbers" and denies them a "benefit[] of marriage afforded to other couples." *Id.* ¶ 92.

Plaintiffs also seek to certify a nationwide class under Fed. R. Civ. P. 23(b). *See id.* ¶¶ 66-74. Specifically, plaintiffs seek to certify the following class: "All persons who are otherwise qualified for and would have received recovery payments but for the fact that they are excluded by 26 U.S.C. § 6428(g)(1)(B) because their spouses lack social security numbers, and where neither the person nor the spouse was a member of the Armed Forces of the United States at any time during the taxable year." *Id.* ¶ 67.

## II.      Standards of Review

### 1.   Rule 12(b)(1)

District courts of the United States are courts of limited jurisdiction; they possess "'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 586 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see Home Depot U.S.A., Inc. v. Jackson*, ___ U.S. ___, 139 S. Ct. 1743, 1746 (2019); *Exxon Mobil Corp. v. Allapattah Servs., Inc*., 545 U.S. 546, 552 (2005). Simply put, "if Congress has not empowered the federal judiciary to hear a matter, then the case must be dismissed." *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'") (citation omitted).

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to challenge the court's subject matter jurisdiction over the plaintiff's suit. Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). However, a court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *B.F. Perkins*, 166 F.3d at 647 (citation omitted).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *accord Hutton v. Nat'l Bd. of Exam'rs Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018). Here, the Government raises a facial challenge to the Court's subject matter jurisdiction, asserting that the doctrine of sovereign immunity forecloses plaintiffs' claims. ECF 31 at 3-4; *see Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (observing that "'sovereign immunity deprives federal courts of jurisdiction to hear claims'") (citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. (2018). In such a case, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated." *Hutton*, 892 F.3d at 621 n.7; *see Kerns*, 585 F.3d at 192.

### 2. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019);

*In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009).  Of course, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Id*. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (citation omitted); *see Semenova v. Md. Transit*

*Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court is not required to accept legal conclusions drawn from the facts."  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019); *see Papasan v. Allain*, 478 U.S. 265, 286 (1986).  "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" under Rule 12(b)(6).  *Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc).  This occurs only when "all facts necessary to the affirmative defense 'clearly appear on the face of the complaint.'"  *Id.* (alteration, emphasis, and citation omitted).

## III.   Discussion

The Government moves to dismiss plaintiffs' suit on three grounds: sovereign immunity, Article III standing, and failure to state a claim.  Defendants first argue that they are entitled to sovereign immunity, and therefore the Court lacks subject matter jurisdiction.  ECF 32 at 3-4.  Second, the Government contends that plaintiffs' alleged injury is too speculative to satisfy Article III standing.  *Id.* at 6-7.  Third, defendants maintain that plaintiffs' constitutional claims fail as a matter of law.  *Id.* at 7-11.  Plaintiffs oppose each argument, asserting that the Administrative

Procedure Act ("APA"), 5 U.S.C. § 702, waives defendants' sovereign immunity; they have adequately pleaded an injury in fact; and the Amended Complaint alleges viable claims.  ECF 36.

I shall address each contention, in turn.

### A.  Sovereign Immunity

According to defendants, the Court is without subject matter jurisdiction to hear plaintiffs' claims because the United States has not expressly waived its sovereign immunity.  ECF 32 at 3-5.  In response, plaintiffs maintain that the APA's waiver of sovereign immunity applies because they seek only declaratory and injunctive relief.  ECF 36 at 3-5; *see* ECF 31, ¶ 26.[8]

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see United States v. Mitchell*, 463 U.S. 206, 212 (1983); *Dalehite v. United States*, 346 U.S. 15, 30 (1953).  That is, the United States is "immune from suit save as it consents to be sued."  *United States v. Sherwood*, 312 U.S. 584, 586 (1941); *see Mitchell*, 463 U.S. at 212 (observing that it is "axiomatic that the United States may not be sued without its consent").  The sovereign immunity of the United States also generally extends to federal officers sued in their official capacity.  *See Dugan v. Rank*, 372 U.S. 609, 620 (1963); *Portsmouth Redev. & Hous. Auth. v. Pierce*, 706 F.2d 471, 473 (4th Cir. 1983).  Therefore, defendants enjoy "a presumption of immunity," *Robinson v. U.S. Dep't of Educ.*, 917 F.3d 799, 801 (4th Cir. 2019), *cert. denied*, __ U.S. ___, 140 S. Ct. 1440 (2020), and plaintiffs have the

---

[8] In the analogous case pending before Judge Grimm, concerning the stimulus benefits for children, the plaintiffs asserted and Judge Grimm determined that, under the seminal case of *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity is waived as to the individual defendants with respect to the plaintiffs' constitutional claims for equitable relief.  *See R.V.*, 2020 WL 3402300, at *5.  Here, plaintiffs have not invoked the *Ex parte Young* exception. Because I conclude that the APA suffices to waive defendants' sovereign immunity, I do not address the applicability of that doctrine to this suit.

burden to demonstrate a waiver of the Government's sovereign immunity. *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005).

A "waiver of sovereign immunity must be unequivocally expressed in statutory text," and be "clearly evident from the language of the statute." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (internal quotation marks omitted); *see Lane v. Pena*, 518 U.S. 187, 192 (1996) (observing that a waiver of sovereign immunity "must be unequivocally expressed in statutory text, and will not be implied"). In other words, a waiver of sovereign immunity "cannot contain an ambiguity, which 'exists if there is a plausible interpretation of the statute that would not authorize money damages against the Government.'" *Robinson*, 917 F.3d at 802 (quoting *Cooper*, 566 U.S. 290-91). Moreover, waivers of sovereign immunity "must be 'strictly construed in favor of the sovereign.'" *Welch*, 409 F.3d at 650 (ellipses omitted) (quoting *Lane*, 518 U.S. at 192). Simply put, sovereign immunity "can only be waived by statutory text that is unambiguous and unequivocal." *Robinson*, 917 F.3d at 802.

Plaintiffs do not identify a waiver of sovereign immunity in the CARES Act. Instead, they locate the waiver in § 702 of the APA. Entitled "Right of Review," it provides, in part, 5 U.S.C. § 702: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency . . . acted or failed to act . . . shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." This waiver of sovereign immunity encompasses claims asserted under the APA as well claims arising under non-APA authority that seek equitable relief from agency action. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) (collecting cases).

Plaintiffs pursue only declaratory and injunctive relief; they do not seek damages. So, it would seem that § 702 applies to their suit. However, § 704 of the APA imposes another limitation

on judicial review, authorizing review of agency action under the APA only if "there is no other adequate remedy in a court." 5 U.S.C. § 704; *see U.S. Army Corps. of Eng'rs v. Hawkes Co.*, ___ U.S. ___, 136 S. Ct. 1807, 1815 (2016); *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Section 704 reflects Congress's judgment that "the general grant of review in the APA" should not "duplicate existing procedures for review of agency action" or "'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.'" *Bowen*, 487 U.S. at 903 (citation omitted).

According to the government, this is where plaintiffs' reliance on the APA founders. ECF 32 at 4. In its view, plaintiffs can challenge the constitutionality of § 6428(g)(1)(B) by bringing a tax refund action against the IRS, pursuant to 26 U.S.C. § 7422(a). If so, then § 704 requires plaintiffs to proceed under § 7422, not the APA. And, in that circumstance, defendants insist that plaintiffs' suit is premature because they have not exhausted their administrative remedies to seek a tax refund. *See* ECF 32 at 5.

The Court's analysis of whether an alternative remedy is "adequate" under § 704 and therefore displaces the APA is guided by several background considerations. First, because the benchmark is adequacy, an alternative remedy will be deemed to preclude the APA so long as it offers the "'same genre'" of relief as the APA. *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009) (citation omitted); *see Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 846 F.3d 1235, 1244 (D.C. Cir. 2017). For instance, the APA is ordinarily not available where another statute provides for *de novo* review of an agency decision in federal district court. *See, e.g.*, *Hinojosa v. Horn*, 896 F.3d 305, 311-13 (5th Cir. 2018) (per curiam) (requiring plaintiffs to challenge passport denial under 8 U.S.C. § 1503, not the APA, because it "provides a direct and guaranteed path to judicial review"); *Gulf Cost Mar. Supply, Inc. v. United States*, 867 F.3d 123,

131 (D.C. Cir. 2017) (holding that the Federal Alcohol Administration Act displaces the APA because it provides for judicial review of alcohol-permit revocations); *Nielsen v. Hagel*, 666 F. App'x 225, 231 (4th Cir. 2016) (concluding that Title VII provides adequate remedy for federal employment discrimination claim).

In contrast, although the alternative remedy "need not provide relief identical to relief under the APA," *Vilsack*, 563 F.3d at 522, a remedy is inadequate if it offers only "doubtful and limited relief." *Bowen*, 487 U.S. at 901.  For instance, in *Bowen*, 487 U.S. 879, the Supreme Court rejected the Government's argument that § 704 barred Massachusetts's APA challenge to the denial of certain Medicaid expense reimbursements because the state could seek money damages in the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491.  *Id.* at 904-05.  That remedy was inadequate, the Supreme Court explained, because the Claims Court "'has no power to grant equitable relief,'" but the Medicaid program envisioned an ongoing relationship between the parties.  *Id.* at 905 (citation omitted).  As a result, the Supreme Court was "not willing to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief."  *Id.*

Further, courts consider whether the alternative remedy "carr[ies] the risk of 'serious criminal and civil penalties,'" or imposes on the plaintiff an "arduous, expensive, and long" administrative process that does not aid in the determination of the underlying legal question. *Hawkes*, 136 S. Ct. at 1815 (citation omitted).  If so, then the remedy is inadequate.  For example, the Supreme Court concluded in *Hawkes*, 136 S. Ct. 1807, that the Army's administrative process for determining whether a body of water was covered under the Clean Water Act was not an adequate alternative to APA review because it entailed expensive scientific assessments that had no "pertinence" to the jurisdictional question.  *See id.* at 1815-16.

Last, a remedy is adequate if the court can discern from the statute "'clear and convincing evidence'" that Congress intended it to supplant the APA. *Citizens for Responsibility*, 846 F.3d at 1244 (citation omitted); *see Hinojosa*, 986 F.3d at 311; *Vilsack*, 563 F.3d at 523. The D.C. Circuit has suggested that the "creation of both agency obligations and a mechanism for judicial enforcement in the same legislation" serve as compelling indicia of an intent to create a specific remedy that trumps the APA. *Citizens for Responsibility*, 846 F.3d at 1245.

Considering these factors here, a refund action brought under § 7422 is not an adequate avenue for plaintiffs to challenge § 6428(g)(1)(B). To begin with, in *King v. Burwell*, 759 F.3d 358 (4th Cir. 2014), *aff'd*, ___ U.S. ___, 135 S. Ct. 2480 (2015), the Fourth Circuit rejected the same argument that the Government now presses. There, the plaintiffs brought an APA action against an IRS rule implementing the Affordable Care Act's health insurance tax credit, which was intended to serve as a carrot to offset the stick of the law's health insurance mandate. *Id.* at 363-65. In defending the rule, the Government asserted that the availability of a tax refund action under § 7422 prevented the plaintiffs from using the APA's waiver of sovereign immunity.

The Fourth Circuit was unpersuaded. It reasoned that the plaintiffs were "not seeking a tax refund; they ask[ed] for no monetary relief, alleging instead claims for declaratory and injunctive relief in an attempt to forestall the lose-lose choice (in their minds) of purchasing a product they do not want or paying the penalty." *Id.* at 366-67. Further, the Court observed that the plaintiffs' suit was "not a typical tax refund action in which an individual taxpayer complains of the manner in which a tax was assessed or collected and seeks reimbursement for wrongly paid sums." *Id.* at 367. Rather, the plaintiffs "challenge[d] the legality of a final agency action, which is consistent with the APA's underlying purpose of 'remov[ing] obstacles to judicial review of agency action.'" *Id.* (second alteration in *King*) (quoting *Bowen*, 487 U.S. at 904). Accordingly, the Fourth Circuit

concluded that because § 7422 did not afford the plaintiffs an adequate remedy, it did not displace the APA.

The same rationale applies here.  As in *King*, plaintiffs pursue only declaratory and injunctive relief.  It is true that if a court were to enjoin the enforcement of § 6428(g)(1)(B), this might well result in plaintiffs' receipt of the impact payment.  But, an injunction's secondary effects do not transform a suit for equitable relief into one for damages.  *See Bowen*, 487 U.S. at 893-94.  Moreover, much as in *King*, this case cannot be characterized as a tax refund action. Plaintiffs do not "complain[] of the manner in which a tax was assessed or collected," nor do they seek "reimbursement for wrongly paid sums."  *King*, 759 F.3d at 367.  Instead, they "challenge the legality of a final agency action," *id.*, namely the implementation of § 6428(g)(1)(B).  Thus, just as § 7422 was an inadequate  remedy in *King*, so it is here.

Putting *King* aside, requiring plaintiffs to seek judicial relief through a tax refund action would erect unnecessarily onerous and costly barriers to plaintiffs' suit.  As defendants note, before an action can be brought under § 7422, the taxpayer must (1) file a tax return; (2) file a timely administrative claim with the IRS; and (3) the IRS must deny the claim or fail to act within six months.  *See* 26 U.S.C. §§ 6511(a), 6532(a)(1); *see* ECF 32 at 5.  This process is intended to promote the efficient resolution of tax disputes by giving the IRS notice of a claim and an opportunity to rectify errors or clarify misunderstandings before the plaintiff goes to federal court. *See United States v. Clintwood Elhorn Min. Co.*, 553 U.S. 1, 11 (2008) (discussing the purposes of § 7422); *Montrios v. United States*, 916 F.3d 1056, 1062 (D.C. Cir. 2019) (same).

Forcing plaintiffs to exhaust their administrative remedies would be an "arduous, expensive, and long" process, *Hawkes*, 136 S. Ct. at 1815-16, that serves none of the goals underlying § 7422.  Before plaintiffs could challenge § 6428(g)(1)(B), they would first have file a

2020 tax return, which they cannot do until 2021. Then, plaintiffs would have to wait until the IRS invariably denies their request for a refund in the amount of the CARES Act payment, because they are ineligible per § 6428(g)(1)(B). Once that happens, plaintiffs would have to file an administrative claim with the IRS, asking it to reconsider its position. But, here too, the IRS will reject plaintiffs' claim, citing § 6428. Thus, administrative exhaustion under § 7422 is guaranteed to be an exercise in futility because there is no possibility that it could provide plaintiffs with relief. *See Cohen v. United States*, 650 F.3d 717, 732 (D.C. Cir. 2011) (en banc) (concluding that the § 7422 was not an adequate alternative to APA where administrative exhaustion could not remedy plaintiff's complaint). This Kafkaesque scenario is at odds with the very purpose of the impact payments—to assist Americans grappling with the economic fallout of a public health catastrophe.

Finally, an examination of § 7422's text reveals no signs of "legislative intent to create a special, alternative remedy and thereby bar APA review." *Citizens for Responsibility*, 846 F.3d at 1244 (internal quotation marks and citation omitted). As noted, § 7422 provides a cause of action for the "recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . ." 26 U.S.C. § 7422(a). Plaintiffs do not seek the recovery of any monies wrongfully "assessed" because they do not allege that the IRS improperly calculated their tax liability. *See Hibbs v. Winn*, 542 U.S. 88, 100 (2004) ("As used in the Internal Revenue Code (IRC), the term 'assessment' involves a 'recording' of the amount the taxpayer owes the Government."). Nor do plaintiffs complain of taxes wrongfully "collected." Instead, they challenge the discriminatory effect of a refundable tax credit under the First and Fifth Amendments. Certainly, the mismatch between the plain language of § 7422 and the nature of plaintiffs' suit does not support the finding that Congress intended § 7422 to replace the APA. In fact, if anything, it leaves the Court "doubtful," *Bowen*, 487 U.S. at 901, that § 7422 can serve as

18

a statutory basis for plaintiffs to challenge § 6428(g)(1)(B).  *Cf. R.V. v. Mnuchin*, PWG-20-1148, 2020 WL 3402300, at *7 (D. Md. June 19, 2020).

Accordingly, I conclude that defendants' sovereign immunity is waived under 5 U.S.C. § 702.  It follows that the Court has subject matter jurisdiction over plaintiffs' suit.

### B.  Standing

Aside from sovereign immunity, the Government argues that plaintiffs' claims are not justiciable because plaintiffs' alleged injury is too speculative to confer Article III standing.  ECF 32 at 6-7.

It is a bedrock principle that Article III of the Federal Constitution confines the federal courts to the adjudication of "actual, ongoing cases or controversies."  *Lewis v. Cont'l Bank Corp*., 494 U.S. 472, 477 (1990); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *Chi. & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892).  "One element of the case-or-controversy requirement" is that a plaintiff must establish Article III standing to sue.  *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *see Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *Ansley v. Warren*, 861 F.3d 512, 517 (4th Cir. 2017) ("An essential element" of the case-or-controversy requirement "is that any party who invokes the court's authority must establish standing").  In short, Article III standing is a *sine qua non* of litigation in federal court.[9]

The "'irreducible constitutional minimum'" of Article III standing is well established: The "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

---

[9] The doctrine of standing consists of two distinct "strands": constitutional standing, pursuant to Article III, and prudential standing.  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004).  The Government only disputes plaintiffs' Article III standing.  *See* ECF 32 at 6-7.

*Spokeo, Inc.*, 136 S. Ct. at 1547 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1993)); *see Thole v. U.S. Bank N.A.*, ___ U.S. ___, 140 S. Ct. 1615, 1618 (2020); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014); *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013); *accord Maryland Shall Issue, Inc. v. Hogan*, ___ F.3d ___, 2020 WL ___, slip op. at 12 (4th Cir. Aug. 3, 2020). At bottom, these requirements ensure that the plaintiff has "'a personal stake in the outcome of the controversy.'" *Gill v. Whitford*, ___ U.S. ___, 138 S. Ct. 1916, 1929 (2018) (citation omitted).

The only dispute regarding plaintiffs' standing centers on the first element, that is, whether they have sufficiently alleged a cognizable injury. Significantly, a plaintiff's burden to show standing tracks the applicable standard of review: "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing. *Lujan*, 504 U.S. at 561; *see Warth v. Seldin*, 422 U.S. 490, 518 (1975) (observing that a plaintiff must "clearly . . . allege facts demonstrating" each standing element); *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240 (4th Cir. 2019) (applying *Iqbal/Twombly* standard to standing).

An injury in fact is the "'[f]irst and foremost' of standing's three elements." *Spokeo*, 136 S. Ct. at 1547 (alteration in *Spokeo*; citation omitted); *see Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019) ("An injury in fact is an indispensable aspect of constitutional standing . . . ."). To satisfy the injury-in-fact requirement, the plaintiff must plausibly allege "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quotation marks and citation omitted); *see Maryland Shall Issue*, 2020 WL ___, slip op. at 12. These subsidiary elements are distinct. *See Spokeo*, 136 S. Ct. at 1548 (opining that

concreteness and particularity are "quite different"); *accord Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020).

A particularized injury "must affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted). To be concrete, the injury must be "real and not abstract." *Id.*; *see Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (requiring the alleged injury to be "distinct and palpable, as opposed to merely abstract"). "'[F]inancial harm is a classic and paradigmatic form of injury in fact.'" *Maryland Shall Issue*, 2020 WL ___, slip op. at 14 (alteration in original and citation omitted). But, concreteness is not coterminous with tangible economic or physical harm. *See Spokeo*, 136 S. Ct. at 1549. To the contrary, an "injury-in-fact is often predicated on intangible harm," *Baehr*, 953 F.3d at 252, including the invisible wounds inflicted by discrimination. *See Allen v. Wright*, 468 U.S. 737 (1984) (remarking that the stigma of discrimination "accords a basis for standing" to "'those persons who are personally denied equal treatment' by the challenged discriminatory conduct") (citation omitted); *see, e.g.*, *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (male retiree had standing to challenge gender-based classification in Social Security allocations); *Bostic v. Schaefer*, 760 F.3d 352, 371-72 (4th Cir. 2014) (same-sex couple had standing to challenge state's same-sex marriage ban).

As for the imminence requirement, although it is "'a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes.'" *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 564 n.2). Accordingly, an allegation of threatened injury in the future is sufficient to establish standing only "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Clapper*, 133 S. Ct. at 1147, 1150 n.5). An

injury that "relies on a highly attenuated chain of possibilities" does not qualify as "certainly impending." *Clapper*, 568 U.S. at 410.

Plaintiffs' alleged injuries easily satisfy these requirements.  ECF 31, ¶ 65; ECF 36 at 5-7. To begin with, plaintiffs claim that because of 26 U.S.C. § 6428(g)(1)(B), they have not received the impact payment to which they and their children are otherwise entitled.  ECF 31, ¶¶ 42-43. This pocketbook injury is the textbook example of injury in fact.  *See Sierra Club v. Morton*, 405 U.S. 727, 733 (1972) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing . . . ."); *see also Pinson v. JPMorgan Chase Bank*, *N.A.*, 942 F.3d 1200, 1207 (11th Cir. 2019) ("[E]conomic harm is a quintessential injury in fact."); *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (concluding that the plaintiff's alleged financial losses satisfied the injury requirement); *Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d. Cir. 2017) (advising that "where a plaintiff alleges financial harm, standing 'is often assumed without discussion'") (citation omitted); *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016) ("Any monetary loss suffered by the plaintiff satisfies the [injury] element . . . ."); *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011) ("A financial injury creates standing.").

Moreover, "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group," the "injury in fact" at issue is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."  *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 657 (1993) ("*NFAGC*").  In other words, discriminatory treatment, if personally experienced by the plaintiff, is a sufficient injury to confer standing.  *See Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004) ("Discriminatory

treatment . . . qualif[ies] as an actual injury for standing purposes."); *see Hassan v. City of New York*, 804 F.3d 277, 290 n.1 (3d Cir. 2015) (collecting cases).

Here, plaintiffs allege the denial of equal of treatment, claiming that § 6428(g)(1)(B) erects barriers that they, but not other eligible, married individuals, must overcome to obtain an impact payment, simply because they are married to someone who lacks legal status.  ECF 31, ¶¶ 34-43.  An individual who satisfies the income threshold and files a joint tax return with a spouse who has a SSN is entitled to receive an impact payment without any further action.   In contrast, § 6428(g)(1)(B) bars plaintiffs from receiving the credit if they file a joint tax return because their spouse lacks a SSN.  Thus, in order to receive the impact payment, plaintiffs must either obtain a divorce, file a separate tax return, resolve their spouse's immigration status, or join the military to qualify for the exception contained in § 6428(g)(3).   This differential treatment, which simultaneously impedes plaintiffs' ability to access a benefit enjoyed by other married individuals and allegedly infringes on the fundamental right of marriage, is a concrete and particular injury.

The Government's arguments to the contrary are not persuasive.  In its view, plaintiffs' alleged injuries are too speculative because "the 2020 tax year has not yet ended," and therefore plaintiffs "may still become eligible for a CARES Act credit or may be ineligible for a reason other than the SSN requirement."  ECF 41 at 3.  In the same vein, defendants argue that courts have consistently rejected the contention that the possibility of future action by the IRS qualifies as an injury in fact.  ECF 32 at 6 (citing *Coon v. Wood*, 160 F. Supp. 3d 246, 251 (D.D.C. 2016)).  But, the Government does not dispute that § 6428(g)(1)(B) distinguishes between plaintiffs and other similarly-situated individuals based solely on the immigration status of their spouses.  This "personal injury," which plaintiffs are presently experiencing, has "long [been] recognized as judicially cognizable."  *Heckler*, 465 U.S. at 738; *see NFAGC*, 508 U.S. at 657.  And, given that

§ 6428(g)(1)(B) compels the denial of impact payments to plaintiffs, their alleged pecuniary harm does not rest on a "speculative chain of possibilities." *Clapper*, 568 U.S. at 414.

In sum, taking plaintiffs' allegations as true, they have plausibly alleged an injury in fact for the purpose of Article III standing. Therefore, I shall deny defendants' Motion to the extent that it seeks dismissal of the suit based on lack of standing.

## C.  Failure to State a Claim

### 1.  Fifth Amendment

Although plaintiffs' claims are justiciable, that does not end the inquiry, because the Government also contends that plaintiffs fail to state causes of action under the Constitution. ECF 32 at 7-11. I turn first to examine the viability of plaintiffs' claims that § 6428(g)(1)(B) violates the Fifth Amendment because it burdens their fundamental right to marriage and singles them out for disfavored treatment based on their spouse's immigration status. ECF 31, ¶¶ 75-81, 89-96.

Under the Due Process Clause of the Fifth Amendment, no person may "be deprived of life, liberty or property, without due process of law." U.S. Const. amend. V. This guarantee has a procedural as well as a substantive component. *See County of Sacramento v. Lewis*, 523 U.S. 833, 856 (1998); *Martin v. St. Mary's Dep't of Soc. Servs.*, 346 F.3d 502, 511 (4th Cir. 2003). Procedural due process ensures that the government employs fair procedures when it seeks to deprive an individual of liberty or property. *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016). But, the Fifth Amendment assures "more than fair process." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). Substantive due process "forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state

interest." *Reno v. Flores*, 507 U.S. 292, 301-02 (1993) (emphasis in *Reno*); *see, e.g.*, *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

The fundamental liberties protected by the Due Process Clause not only include those enumerated in the Bill of Rights but also "certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell v. Hodges*, ___ U.S. ___, 135 S. Ct. 2584, 2597 (2015); *see, e.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 501 (1965) (recognizing fundamental right of married couples to use contraception). Accordingly, the Supreme Court "has long held the right to marry is protected by the Constitution," and it has repeatedly "reiterated that the right to marry is fundamental under the Due Process Clause." *Obergefell*, 135 S. Ct. at 2598; *see, e.g.*, *United States v. Windsor*, 570 U.S. 744 (2013) (striking down the Defense of Marriage Act); *Turner v. Safley*, 482 U.S. 78 (1987) (prisoners cannot be denied the right to marry as a penological measure); *Zablocki v. Redhail*, 434 U.S. 374 (1978) (right to marry includes the right to marry a noncustodial parent behind on existing child support obligations); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause . . . ."); *Loving v. Virginia*, 388 U.S. 1 (1967) (invalidating ban on interracial marriage); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (recognizing the right "to marry" and "establish a home and bring up children").

Indeed, the Court's many descriptions of marriage are striking.  The Court has called marriage "the most important relation in life . . . . without which there would be neither civilization nor progress," *Maynard v. Hill*, 125 U.S. 190, 205, 211 (1888); "fundamental to the very existence and survival of the race," *Skinner v. Okla. ex rel. Williamson*, 316 U.S. 535, 541 (1942); "one of the 'basic civil rights of man,'" *Loving*, 388 U.S. at 12 (citation omitted); "of fundamental

importance for all individuals," *Zablocki*, 434 U.S. at 384; and of "transcendent importance" that "promise[s] nobility and dignity to all persons, without regard to their station in life." *Obergefell*, 135 S. Ct. at 2594.

Notably, the fundamental right of marriage does not end at "I do."  Rather, the Court's recent marriage cases make clear that the right covers the decisions, benefits, and obligations adjunct to marriage.  In *Windsor*, 570 U.S. 744, the Court struck down the Defense of Marriage Act ("DOMA"), which limited federal recognition of marriage to heterosexual unions.  *See id.* at 775.  Although DOMA did not prevent same-sex couples from marrying, the Court found that it violated the Fifth Amendment because it placed same-sex couples married under the laws of their state "in an unstable position of being in a second-tier marriage."  *Id.* at 772.  Besides serving to "demean[] the couple" and "humiliate[] tens of thousands of children now being raised by same-sex couples," the Court also took stock of DOMA's "visible" burdens, namely that it denied same-sex married couples an array of federal benefits afforded to heterosexual married couples, including health care benefits, the Bankruptcy Code's protections, the ability to file a joint tax return, and eligibility to be buried as a couple in veterans' cemeteries.  *Id.* at 773-774.

Further, in *Obergefell*, 135 S. Ct. 2584, in which the Court held that the Due Process Clause of the Fourteenth Amendment requires states to recognize same-sex marriages, the Court identified four reasons why marriage belongs in the pantheon of fundamental rights.  *Id.* at 2599.  First, marriage is a choice "inherent in the concept of individual autonomy" because "through its enduring bond, two persons together can find other freedoms, such as expression, intimacy, and spirituality."  *Id*.  Along similar lines, marriage "is fundamental because it supports a two-person union unlike any other in its importance to the committed individuals."  *Id.*  Third, marriage "safeguards children and families" by "giving recognition and legal structure to the[] parents'

relationship" and "permanency and stability important to children's best interests." *Id.* at 2600. Fourth, marriage is a "keystone of our social order," as it is the "basis for an expanding list of governmental rights, benefits, and responsibilities," including "taxation." *Id.* at 2601. These interests hardly dissipate at the altar; rather, they continue throughout the life of the marriage. The Due Process Clause thus covers not only the right to enter into a marriage but also the "constellation of benefits" that are inextricably intertwined with marriage. *Id.*

The case of *Pavan v. Smith*, ___ U.S. ___, 137 S. Ct. 2075 (2017) (per curiam), the Court's most recent word on marriage, extinguishes any doubts that the fundamental right of marriage encompasses more than the decision to marry. In *Pavan*, two married same-sex couples challenged an Arkansas statute that required the name of the mother's male spouse to appear on a child's birth certificate but not the name of a female spouse. *Id.* at 2076-77. "*Obergefell* proscribes such disparate treatment," the Court observed, because "a State may not 'exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples.'" *Id.* at 2078 (quoting *Obergefell*, 135 S. Ct. at 2605). Accordingly, the Court concluded that because Arkansas uses birth certificates "to give married parents a form of legal recognition," it "may not, consistent with *Obergefell*, deny married same-sex couples that recognition." *Id.* at 2078-79.

In addition to procedural and substantive due process, the Supreme Court has held that the Fifth Amendment implicitly guarantees the right to equal treatment enshrined in the Fourteenth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497 (1954); *see also Windsor*, 570 U.S. at 774 ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."). Thus, courts apply Fourteenth Amendment jurisprudence to equal protection claims brought against the federal government. *See Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area

27

is the same as that under the Fourteenth Amendment."); *accord Sessions v. Morales-Santana*, ___

U.S. ___, 137 S. Ct. 1678, 1686 n.1 (2017).

The Fourteenth Amendment's Equal Protection Clause states: "No State shall . . . deny to

any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

This guarantee "is essentially a direction that all persons similarly situated should be treated alike."

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  To prevail on an equal

protection challenge, a plaintiff "'must first demonstrate that he has been treated differently from

others with whom he is similarly situated and that the unequal treatment was the result of

intentional or purposeful discrimination.'"  *Kolbe v. Hogan*, 849 F.3d 114, 146 (4th Cir. 2017) (en

banc) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).  If that showing is

made, the court "'proceeds to determine whether the disparity in treatment can be justified under

the requisite level of scrutiny.'"  *Kolbe*, 849 F.3d at 146 (quoting *Morrison*, 239 F.3d at 654).

Due process and equal protection work in "synergy" to protect the right of marriage.

*Obergefell*, 135 S. Ct. at 2603.  In *Loving*, 388 U.S. 1, the Court struck down Virginia's ban on

interracial marriage as racially discriminatory and a violation of substantive due process.  *Id.* at

12.  Likewise, in *Zablocki*, 434 U.S. 374, the Court relied on both equal protection and due process

principles to invalidate a Wisconsin law barring fathers who were behind on child support

obligations from marrying.  *See id.* at 383-87.  And, in *Obergefell*, 135 S. Ct. 2584, the Court found

that the "interlocking nature of these constitutional safeguards" compelled the conclusion that "the

right to marry is a fundamental right . . . and under the Due Process and Equal Protection Clauses

of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that

liberty."  *Id.* at 2605.  Thus, although equal protection and due process are "independent

principles," *id.* at 2602, both inform the assessment of laws that touch on marriage.

Under both the Due Process and Equal Protection Clauses, burdens on a fundamental right trigger strict scrutiny. *See City of Cleburne*, 473 U.S. at 440; *Bostic*, 760 F.33d at 377. A law survives strict scrutiny "only if [it is] suitably tailored to serve a compelling state interest." *City of Cleburne*, 473 U.S. at 440. Stated otherwise, "a statutory classification [that] significantly interferes with the exercise of a fundamental right . . . cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki*, 434 U.S. at 388; *see Carey v. Population Servs. Int'l*, 431 U.S. 678, 686 (1977). The proponent of the law bears the burden of satisfying strict scrutiny. *See Bostic*, 760 F.33d at 377.

In contrast, a burden or classification that does not impinge a fundamental right does not ordinarily raise concerns. *See Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012); *FCC v. Beach Commc'ns*, 508 U.S. 307, 314-15 (1993). Instead, such classifications receive only rational basis review. *Beach Commc'ns*, 508 U.S. at 313. Under the rational basis standard, the challenged statute need only be "'rationally related to a legitimate state interest.'" *Pulte Home Corp. v. Montgomery County*, 909 F.3d 685, 693 (4th Cir. 2018) (citation omitted). A law clears this hurdle "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns*, 508 U.S. at 313.

Rational basis review is a "paradigm of judicial restraint"; it "is not license for courts to judge the wisdom, fairness, or logic of the legislative choices." *Id.* at 313-14. But, despite this deference, the scrutiny required by rational basis review "is not a toothless one." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). To pass muster, the law "must find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 321 (1993). And, the Government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446.

29

Plaintiffs have plausibly alleged that § 6428(g)(1)(B) burdens their fundamental right of marriage and singles them out for disfavored treatment on the basis of marriage.  The ability to file a federal joint tax return is a fixture in the "constellation of benefits" that the federal government "has linked to marriage."  *Obergefell*, 135 S. Ct. at 2601; *see Windsor*, 570 U.S. at 772-73 (recognizing joint tax filing as an "aspect of married and family life").  However, § 6428(g)(1)(B) deprives plaintiffs, who are U.S. citizens, of a tax credit because of their choice of a spouse, *i.e.*, a person who lacks a SSN.  To be sure, as mentioned above, plaintiffs are not wholly precluded from obtaining the impact payment; they can become eligible for the credit, notwithstanding their spouse's status, if, for example, they file their 2020 tax return separately or join the military.  But, these options are not without significant costs.  For instance, filing jointly is generally preferable to filing separately because, among other reasons, joint filers are taxed according to a more favorable tax rate.  *See Camara v. Comm'r*, 149 T.C. 317, 318 & n.7 (2017) (outlining the advantages of filing jointly).  And, not everyone is in a position to join the military.

Moreover, plaintiffs have plausibly alleged that § 6428(g)(1)(B) deprives them of a tax benefit enjoyed by other married individuals on the basis of immigration status.  This differentiation "demeans the couple, whose moral and sexual choices the Constitution protects and whose relationship the State has sought to dignify."  *Windsor*, 570 U.S. at 772 (internal citation omitted). And, denying plaintiffs the $500 benefit for each of their American children, pursuant to § 6428(g)(1)(B), "brings financial harm," *id*. at 774, to those children solely because of their parents' marital status.  *See R.V.*, 2020 WL 3402300, at *8 (finding American children of parents excluded from impact payment stated a viable equal protection claim against § 6428(g)).  On the whole then, plaintiffs have plausibly alleged that § 6428(g)(1)(B) is similar to DOMA in that it "singles out a class of persons deemed by a State entitled to recognition" and "imposes a disability

on the class by refusing to acknowledge a status the State finds to be dignified and proper." *Windsor*, 570 U.S. at 775.  Of course, "*Obergefell* proscribes such disparate treatment."  *Pavan*, 137 S. Ct. at 2078.

Accordingly, plaintiffs have adequately alleged that § 6428(g)(1)(B) imposes a discriminatory burden on the fundamental right of marriage.  And, in that case, the burden shifts to the Government to demonstrate that the law passes constitutional muster.

The Government avers that § 6428(g)(1)(B) is subject to rational basis review because it is a tax provision that "distinguishes based on marital status."  ECF 32 at 7.  This argument is misguided.  Section 6428(g)(1)(B) discriminates between married taxpayers on the basis of their spouse's immigration status, a characteristic that has no apparent relevance to the individual's tax liability.  In contrast, the cases on which the Government relies concern the tax rate structure set forth in 26 U.S.C. § 1, which varies based on income and whether the taxpayer is married or single. *See Druker v. Comm'r*, 697 F.2d 46 (2d Cir. 1982) (rejecting equal protection challenge to marriage penalty for joint tax filers); *Mapes v. United States*, 576 F.2d 896 (Ct. Cl. 1978) (same). Therefore, these cases seem inapt.

And, even taking the Government's argument at face value, plaintiffs have plausibly alleged that § 6428(g)(1)(B) fails to clear the low bar of rational basis review.  The Government proffers that § 6428(g)(1)(B) furthers Congress's legitimate interest "of providing the credit only to individuals authorized to work in the United States, and not to ineligible individuals," especially in light of Congress's "desire to disburse aid efficiently."  ECF 32 at 10.  But, it would appear that depriving plaintiffs of the credit is an unnecessary prophylactic given that § 6428(g)(1)(A) limits receipt of the impact payment to individuals with a SSN.  Moreover, the Government's proffered justification is undermined by § 6428(g)(3), which permits couples to receive an impact payment,

despite a spouse's lack of a SSN, if the other spouse serves in the armed forces.  Thus, even assuming that rational basis applies, plaintiffs have stated a claim under the Fifth Amendment.

For these reasons, I shall deny defendants' Motion as to plaintiffs' causes of action arising under the Fifth Amendment.

### 2.   First Amendment

Plaintiffs' second cause of action alleges that § 6428(g)(1)(B) violates the First Amendment's guarantees of freedom of speech and association.  ECF 31, ¶¶ 82-88.  In plaintiffs' view, § 6428(g)(1)(B) burdens their First Amendment rights "by denying them recovery payments because they express their lawful marriage and commitment to, and association with, their spouses in their most recently jointly-filed federal tax returns."  *Id.* ¶ 85.

The Free Speech Clause of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  This mandate "means that government generally has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Barr v. Am. Assoc. of Political Consultants, Inc*., ___ U.S. ___, 140 S. Ct. 2335, 2346 (2020) (quotation marks and citation omitted).  However, the right to speech is "not absolute," *Virginia v. Black*, 538 U.S. 343, 358 (2003), and the First Amendment does not protect "nonexpressive conduct" nor prohibit "restrictions directed at commerce or conduct [that] impos[e] incidental burdens on speech."  *Sorrell v. IMS Health Inc*., 564 U.S. 552, 568 (2011).

Although the First Amendment "literally forbids the abridgment only of 'speech,'" the Supreme Court has "long recognized that its protection does not end at the spoken or written word."  *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *see Willis v. Town of Marshall*, 426 F.3d 251, 257 (4th Cir. 2005) ("It is well established that the First Amendment protects expressive conduct as well as pure speech.").  Thus, conduct that is "sufficiently imbued with elements of

communication" also receives First Amendment protection.  *Spence v. Washington*, 418 U.S. 405, 409 (1974); *see Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986).  Conduct-based laws implicate speech rights where the conduct itself communicates a message, *see, e.g.*, *Holder v. Humanitarian Law Projec*t, 561 U.S. 1, 28 (2010); the conduct has an expressive element, *see, e.g.*, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); or where the conduct is intertwined with protected First Amendment activity.  *See, e.g.*, *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,* 460 U.S. 575, 585 (1983).

As a necessary corollary to speech, the First Amendment also protects the right to associate with others.  *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000); *see Shelton v. Tucker*, 364 U.S. 479, 485-86 (1960) (describing freedom to associate as "closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society").  In particular, this derivative right encompasses two categories of activity: first, the choice to "enter into and maintain certain intimate human relationships," and, second, association "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984).  The former associations "receive[] protection as a fundamental element of personal liberty."  *Id.* at 618.  In contrast, protection for the latter associations stems from the insight that an individual's right to speak or petition the government would be worth little if "the freedom to engage in group effort toward those ends were not also guaranteed."  *Id.* at 622; *see Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006).

Despite the First Amendment's crystalline prohibition, implementing its guarantees is hardly straightforward.  Because "the First Amendment protects speech along a spectrum," *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019), laws burdening speech "receive different levels of

judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it." *Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014).  To be sure, the First Amendment's variegations are too numerous to count.  But, assessing whether a law infringes on the First Amendment proceeds along a familiar path.

"The threshold question" in addressing any First Amendment challenge is "'whether any protected First Amendment right is involved.'"  *Billups v. City of Charleston*, 961 F.3d 673, 682 (4th Cir. 2020) (quoting *Willis v. Town of Marshall*, 426 F.3d 251, 257 (4th Cir. 2005)).  "If no such right is involved," then the "First Amendment inquiry ends."  *Billups*, 961 F.3d at 682; *see Cornelius v. NAACP*, 473 U.S. 788, 797 (1985).  However, if "a protected First Amendment right is involved," then the court must ascertain "whether the Governmental action in question infringes that right."  *Billups*, 961 F.3d at 682.

The Government maintains that § 6428(g)(1)(B) does not implicate the First Amendment, asserting that filing a joint tax return is neither speech nor expressive conduct.  ECF 32 at 11.  In any event, § 6428(g)(1)(B) does not burden plaintiffs' speech or associational rights, the Government posits, because it does not prohibit plaintiffs from filing a joint tax return and the filing status of "married filing separately" is not inconsistent with marriage.  *See id.*; ECF 41 at 5.

Plaintiffs counter that the "First Amendment protects speech on tax forms" and charge the Government with misconstruing the case law on this subject.  ECF 36 at 10-11.  Further, plaintiffs contend that filing a joint tax return constitutes expressive conduct because it conveys a commitment to their spouses and serves as a symbol of marriage.  *Id.* at 11-12 (citing ECF 31, ¶¶ 84-85).  Taking a different tack, plaintiffs also argue that they have plausibly alleged that § 6428(g)(1)(B) violates their right of intimate association by denying them a tax credit because they are married to individuals who lack legal immigration status.  *Id.* at 12.

34

It is far from clear that the notation of a taxpayer's filing status on a tax return constitutes either speech or expressive conduct.  On the one hand, "the creation and dissemination of information are speech within the meaning of the First Amendment."  *Sorrell*, 564 U.S. at 568; *see Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001).  Applying this reasoning, the Supreme Court has applied the First Amendment to pharmacy records, *Sorrell*, 564 U.S. at 570; beer labels, *Rubin v. Coors Brewing Co*., 514 U.S. 476, 481 (1995); and credit reports.  *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749, 759 (1985) (plurality opinion).  At first blush, a tax return is merely an arrangement of information, much like a pharmacy record or nutrition label.

But, another line of cases concerning 26 U.S.C. § 6702, which imposes a $5,000 penalty on an individual who files a "frivolous" tax return, cuts the other way.  Courts are in agreement that § 6702 does not violate the First Amendment because, among other reasons, it sanctions conduct—noncompliance with federal tax law—not the taxpayer's expression of any particular view.  *See, e.g.*, *Buck v. United* States, 967 F.2d 1060, 1062 (5th Cir. 1992); *Hettig v. United States*, 845 F.2d 794, 795 (8th Cir. 1988) (per curiam); *Bradley v. United* States, 817 F.2d 1400, 1405-06 (9th Cir. 1987); *McKee v. United States*, 781 F.2d 1043, 1047 (4th Cir. 1986); *Collett v. United States*, 781 F.2d 53, 55 (6th Cir. 1985); *Welch v. United States*, 750 F.2d 1101, 1108-11 (1st Cir. 1985); *Kahn v. United States*, 753 F.2d 1208, 1216-17 (3d Cir. 1985).  Read broadly, these cases support the Government's view that filing a tax return is merely conduct—the transmission of a taxpayer's income—that is part and parcel of tax collection.  *But see United States v. Rowlee*, 899 F.2d 1275, 1279 (2d Cir. 1990) (remarking that although every court of appeals has concluded that false tax returns do not garner First Amendment protection, "they do not all [employ] the same line of reasoning").

Plaintiffs' argument that their tax returns are expressive conduct is an even steeper hill to climb.  The First Amendment distinguishes between "protected expression" and "nonexpressive conduct," *Sorrell*, 564 U.S. at 567, because "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities." *Arcara*, 478 U.S. at 706; *see also United States v. O'Brien*, 391 U.S. 367, 376 (1968) (deriding the "view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea").  Indeed, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."  *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

The question, then, is whether conduct is "sufficiently imbued with elements of communication" so as to be symbolic speech entitled to First Amendment protection.  *Spence*, 418 U.S. at 409.  To determine whether conduct is sufficiently expressive, courts consider both the intent of the speaker and the perception of the audience.  *See Clark*, 468 U.S. at 294; *see Texas*, 491 U.S. at 404.  The speaker must demonstrate an "intent to convey a particularized message," and "the likelihood [must be] great that the message would be understood by those who viewed it."  *Spence*, 418 U.S. at 410-11; *see Clark*, 468 U.S. at 294 (the conduct must be "intended to be communicative" and, "in context, would reasonably be understood by the viewer to be communicative").[10]  Well-known examples of symbolic speech include marching in a parade,

---

[10] In *Hurley*, 515 U.S. 557, the Supreme Court appears to have modified the first prong of the test as articulated in *Spence*, 418 U.S. 405.  In *Hurley*, the Court opined that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll."  The courts of appeals are divided as to how best to apply *Spence* in light of *Hurley*. *Compare Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 n.6 (2d Cir.

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos*., 515 U.S. 557, 569-70 (1995); nude dancing, *Barnes v. Glen Theatre, Inc*., 501 U.S. 560, 565-566 (1991); burning the American flag, *Texas*, 491 U.S. at 405-06; and wearing a black armband.  *Tinker v. Des Moines Indep. Cmty. Sch. Dist*., 393 U.S. 503, 505-506 (1969).

Proceeding on these principles, it is doubtful that selecting the status of "married filing jointly" on a tax return is expressive conduct.  To be sure, plaintiffs claim that they believe that filing a joint tax return is "an expression of their marriages and the unity of their families."  ECF 31, ¶ 61.  But, plaintiffs have not plausibly alleged that their intended message is likely to be perceived by the IRS.

When filing a federal tax return, taxpayers must choose among five filing statuses: unmarried, head of household, married filing jointly, married filing separately, or widow.  *See* 26 U.S.C. § 1(a)-(d).  Although the taxpayer may have some choice in selecting a filing status, the designation simply reflects the filer's marital status.   And, whether a filer is "married" is not a matter of personal view; the term is defined by the Internal Revenue Code and the IRS's implementing regulations.  *See* 26 U.S.C. § 2 ("Definitions and special rules"); *id.* § 7703 ("Determination of marital status"); 26 C.F.R. § 301.7701-18 (defining spouse and marriage).  Consequently, a married individual cannot file a tax return as unmarried just as a widower cannot file as married.  Filing a joint tax return therefore does not espouse a *view* of marriage so much as it identifies whether or not the filer *is* married.

---

2004) (reading *Hurley* to leave *Spence* intact), *with Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 160 (3d Cir. 2002) (concluding that *Hurley* eliminated the particularized message requirement).

To my knowledge, the Fourth Circuit has not addressed this issue.  However, I need not decide who has the better reading of the precedent because I conclude that even if a tax return is expressive conduct, § 6428(g)(1)(B) does not burden plaintiffs' speech.

This is especially true given that a tax return, and hence a taxpayer's filing status, is ordinarily viewed only by the IRS.  26 U.S.C. § 6103(a); *see Spence*, 418 U.S. at 410 (noting that the reasonable person prong is context-specific).  To the IRS, a taxpayer's filing status is relevant only insofar as it determines the individual's tax liability.  *See* 26 U.S.C. § 1(a)-(d).  Indeed, the Amended Complaint is devoid of any allegations that the message that plaintiffs divine from filing a joint return tax is one that a reasonable observer would perceive, no less the IRS.

Ultimately, however, I need not decide whether a truthful tax return falls within the First Amendment's ambit because even assuming, *arguendo*, that it does, plaintiffs have not plausibly alleged that § 6428(g)(1)(B) burdens their speech rights.  First, § 6428(g)(1)(B) does not penalize plaintiffs for expressing their views on marriage.  Rather, it bars plaintiffs from receiving an impact payment based on conduct, specifically marrying and filing a joint tax return with an individual lacking legal status.  Although such discrimination may violate the Fifth Amendment, it does not implicate speech.  Second, § 6428(g)(1)(B) does not impinge on plaintiffs' ability to convey their beliefs concerning marriage because filing a tax return as "married filing separately" is not inconsistent with proclaiming oneself married.  Thus, there is no communicative difference between filing "married filing separately" and "married filing jointly."  For these reasons, plaintiffs have not plausibly alleged that § 6428(g)(1)(B) violates their right to freedom of speech.

However, in my view, the Amended Complaint states a claim for violation of plaintiffs' associational rights.  As noted, freedom of association protects the right "to enter into and maintain certain intimate human relationships."  *U.S. Jaycees*, 468 U.S. at 617.  Marriage, the most intimate human relationship, is indisputably an intimate association for the purposes of the First Amendment.  *Bd. Dirs. of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 548 (1987) (recognizing marriage as an "intimate relationship[] . . . accorded constitutional protection"); *see Obergefell*,

135 S. Ct. at 2589 (recognizing marriage as a "two-person union unlike any other in its importance to the committed individuals"); *see id.* at 2598 (describing marriage as an "intimate bond"); *Griswold*, 381 U.S. at 501 ("Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred."); *see generally* Kenneth L. Karst, *The Freedom of Intimate Association*, 89 YALE L.J. 624 (1980) (contending that freedom of intimate association draws on the First Amendment, equal protection, and substantive due process).

A law that burdens associational rights triggers strict scrutiny only if it is "direct and substantial," *Lyng v. Int'l Union*, 485 U.S. 360, 367 (1988), or "significant." *Rotary Club*, 481 U.S. at 548; *see Kraham v. Lippman*, 478 F.3d 502, 506 (2d Cir. 2007) (Sotomayor, J.).  An interference is substantial if, for example it "impose[s] penalties or withhold[s] benefits from individuals because of their membership in a disfavored group, . . . attempt[s] to require disclosure of the fact of membership in a group seeking anonymity, . . . [or] tr[ies] to interfere with the internal organization or affairs of the group." *U.S. Jaycees*, 468 U.S. at 609.  As discussed above, plaintiffs have alleged plausibly that § 6428(g)(1)(B) is subject to strict scrutiny because it denies an impact payment to eligible taxpayers such as themselves on the basis of their marital status.  Therefore, for the same reasons that plaintiffs have stated a Fifth Amendment claim, they have also alleged a viable violation of their First Amendment right to intimate association.

Accordingly, I shall deny the Motion as to plaintiffs' First Amendment cause of action.

## IV.    Conclusion

For the aforementioned reasons, I shall deny the Motion (ECF 8), without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: August 5, 2020                                        _____/s/_____

                                                            Ellen L. Hollander
                                                            United States District Judge