IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JUANA RUEDA,

    *Plaintiff*,

v.

                               Civil Action No. ELH-20-1102

JANET YELLEN, *et al*.,

    *Defendants*.

## MEMORANDUM OPINION

This case presents constitutional challenges to a portion of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. 116-136, 134 Stat. 281 (2020), and as later amended by the Consolidated Appropriations Act, 2021 (the "CAA"), Pub. L. 116-260, Div. N, Title II, § 273(a), 134 Stat. 1182, 1976-78 (2020). Congress enacted the CARES Act in March 2020 in response to the health and economic crisis caused by the COVID-19 pandemic. It was amended on December 27, 2020, when President Trump signed the CAA into law. The provision in issue, 26 U.S.C. § 6428, concerns stimulus payments to eligible taxpayers, generally in the form of an advanced refund of a tax credit.

Sixteen plaintiffs, all U.S. citizens, initially filed suit in this case, challenging the constitutionality of the CARES Act. ECF 1. Because their spouses lacked legal status, and did not have a Social Security Number ("SSN"), they were not eligible for the stimulus payments. *Id.* But, as a result of the CAA, Juana Rueda is the only remaining plaintiff.

Rueda has filed a "Second Amended Class Action Complaint For Declaratory And Injunctive Relief." ECF 66 ("SAC").[1] The defendants are Janet Yellen, the Secretary of the U.S.

---

[1] By Order of March 2, 2021 (ECF 60), I permitted the filing of the SAC.

Department of the Treasury (the "Secretary"); Charles Rettig, the Commissioner of the Internal Revenue Service (the "IRS"); the U.S. Department of the Treasury; and the IRS (collectively, the "Government").  *Id.* ¶¶ 10-13.[2]

Under 26 U.S.C. § 6428(a)(1), an "eligible individual . . . shall be allowed" a "credit against the tax imposed" for the 2020 tax year in the amount of $1,200, or $2,400 "in the case of eligible individuals filing a joint return."[3]  An eligible individual also receives an additional $500 credit for each qualifying child under the age of seventeen.  *Id.* § 6428(a)(2).  Receipt of this money "shall be treated" as a refundable credit, *id.* § 6428(b), meaning that the impact payment is not taxed even if it exceeds the recipient's tax liability.  Notably, in 2020 the advance refund of the tax credit was based on the information in the filer's 2018 or 2019 tax return.  *See* 26 U.S.C. §§ 6428(f)(1), (5).  Further, the CARES Act directed the Secretary of the Treasury to issue the refund or credit "as rapidly as possible," but specified that no refund or credit "shall be made or allowed" after December 31, 2020.  *Id.* § 6428(f)(3)(A).

However, as originally enacted, a provision of the CARES Act, Title II, § 2201(a), 134 Stat. at 335-40, codified at 26 U.S.C. § 6428(g)(1)(B) (March 2020), denied economic assistance to an otherwise eligible individual if his or her spouse lacked a SSN and the couple filed a joint tax return.[4]  As noted, the original sixteen plaintiffs, all United States citizens whose spouses lack

---

[2] Steven Mnuchin, who was Secretary of the Treasury during the Trump administration, was named as a defendant when suit was initially filed.  He has been replaced by Yellen.  *See* EECF 66, ¶ 10.  The other defendants remain the same.

[3] The amount of the credit decreases above certain adjusted gross income ("AGI") levels, depending on the individual's filing status.  The phaseout begins at an AGI of $150,000 for joint filers, $112,500 for head-of-household filers, and $75,000 for those filing single or married filing separately.  26 U.S.C. § 6428(c).

[4] In this Memorandum Opinion, I typically cite to the amended version of 26 U.S.C. § 6428, using the citation "26 U.S.C. § 6428."  To avoid confusion between citations to the original

legal status, challenged the constitutionality of this provision. *See* ECF 31 (the "First Amended Complaint"). They asserted, *inter alia*, that 26 U.S.C. § 6428(g)(1)(B) violated the First and Fifth Amendments to the Constitution. *Id.* ¶¶ 75-96.[5]

In a Memorandum Opinion (ECF 43) and Order (ECF 44) of August 5, 2020, I denied the Government's motion to dismiss. *See Amador v. Mnuchin*, 476 F. Supp. 3d 125 (D. Md. 2020). In particular, I rejected the Government's contentions that the United States had not waived its sovereign immunity; that plaintiffs lacked standing; that plaintiffs had failed to state a claim under the Fifth Amendment's due process and equal protection principles; and that plaintiffs had failed to state a claim under the First Amendment's protection of freedom of association. ECF 43 at 12-32, 38-39. But, I agreed with the Government that plaintiffs had failed to state a claim under the free speech clause of the First Amendment. *Id.* at 32-38.

In December 2020, while the parties were engaged in discovery, Congress amended the CARES Act. Of relevance here, by way of the CAA, Congress expanded 26 U.S.C. § 6428(g) to permit married couples who file taxes jointly to claim the CARES Act credit even if only one spouse possesses a SSN. *See* 26 U.S.C. § 6428(g)(1)(B)(i).[6] But, Congress retained the requirement that both spouses have SSNs in order to receive advance refunds of the tax credit, and

---

version of the provision and the amended version, I shall use the citation "26 U.S.C. § 6428 (March, 2020)" when I am referring to the original provision.

[5] In both the First Amended Complaint (ECF 31 at 19) and the Second Amended Complaint (ECF 66 at 20), plaintiff(s) cite to the "Equal Protection Clause" of the Fifth Amendment. However, no such clause exists in the Fifth Amendment. Rather, § 1 of the Fourteenth Amendment contains such a clause. Nonetheless, this mistake is of no moment because equal protection principles apply to the federal government through the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

[6] In this Memorandum Opinion, I sometimes refer to the individuals who became eligible to receive the CARES Act credit as "newly eligible individuals."

it also maintained the deadline of December 31, 2020, for issuance of advance refunds. *See* 26 U.S.C. § 6428(f)(3)(A). As a result, "newly-eligible individuals were shut out of the advance refund component of the program." ECF 66, ¶ 3. Instead, they had to claim the tax credit on their 2020 federal income tax returns. *Id.* ¶¶ 51-54. But, those who were initially eligible for the tax credit, and received it via the advance refund, based their requests on their 2018 or 2019 tax returns. In contrast, those who were newly eligible had to base the request on information pertaining to the 2020 tax year.

Rueda was not eligible for an advance payment, and instead had to claim the tax credit on her 2020 tax return. 26 U.S.C. § 6428(f)(1), (5). However, because Rueda has a son who turned 17 during 2020, and plaintiff could pursue the assistance only by filing a tax return for 2020, Rueda was ineligible for the $500 tax credit provided by 26 U.S.C. § 6428 for a child under the age of 17. ECF 66, ¶¶ 1-7, 9, 51-55. Thus, Rueda asserts that she continues to be harmed by the structure of 26 U.S.C. § 6428 merely because her husband lacks a SSN. As a result, she renews her claims of violations of her rights under the First and Fifth Amendments. *Id*. ¶¶ 70-91.

The Government has moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). ECF 73. It is supported by a memorandum. ECF 73-1 (collectively, the "Motion"). Plaintiff opposes the Motion. ECF 74 (the "Opposition").[7] And, the Government has replied. ECF 75 (the "Reply"). Thereafter, the Court requested additional briefing as to any cases from other courts addressing the circumstances presented in the SAC. ECF 80. Although the parties provided the requested briefing, they did not identify any cases squarely on point. *See* ECF 81 (Government's response); ECF 82 (plaintiff's response).

---

[7] Curiously, plaintiff did not title her submission or even identify the filer.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion.

## I.       Factual Background[8]

The COVID-19 virus triggered the worst public health crisis the country has experienced since 1918.[9] The novel coronavirus is a highly contagious and sometimes fatal respiratory illness. As of March 7, 2022, the coronavirus has infected some 446 million individuals worldwide and has caused roughly 6 million deaths, including approximately 958,000 deaths in the United States as well as 79 million infections. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Mar. 7, 2022).[10]

The virus first appeared in Wuhan, China in December 2019. In a matter of months, COVID-19 spread to every corner of the globe. On March 12, 2020, the World Health Organization declared COVID-19 a global pandemic. *See* WHO Director-General's opening remarks at the mission briefing on COVID-19, World Health Org. (March 12, 2020),

---

[8] In presenting the facts, I draw on the summary set forth in my earlier Memorandum Opinion (ECF 43), which I have supplemented, as needed.

Given the posture of the case, I must assume the truth of all factual allegations in the Complaint. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). However, the Court can "take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

[9] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, World Health Org., https://bit.ly/2UMC6uW (last accessed Feb. 10, 2022).

[10] Fatality rates increase with age and underlying health conditions, such as cardiovascular disease, respiratory disease, diabetes, and immune compromise. *See People with Certain Medical Conditions*, Ctrs. for Disease Control and Prevention (Dec. 14, 2021), https://bit.ly/38S4NfY.

https://bit.ly/2XWdodD.  The next day, President Trump declared a national emergency.  *See* The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://bit.ly/3flFu8i.

As the virus began to spread, the Centers for Disease Control and Prevention implored those living in this country to practice "social distancing," in order to help thwart the spread of the virus.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba.  And, in the spring of 2020 nearly every state in the country issued mandatory stay-at-home orders, directing residents to remain at home except to conduct essential activities.  *See Sarah Mervosh et al.*, *See Which States Are Reopening and Which Are Still Shut Down*, N.Y. TIMES (May 15, 2020), https://nyti.ms/2Z6Fm7F. As a result, life as we know it largely came to a halt; schools, restaurants, bars, shopping malls, retail stores, and houses of worship all shuttered for a significant period of time.

Social distancing measures, although necessary to stem the spread of the virus, had enormous economic consequences.  Personal consumption in March 2020 plummeted by a record 7.5 percent.  *See Personal Income and Outlays: March 2020*, U.S. BUREAU OF ECON. ANALYSIS (Apr. 30, 2020 8:30 a.m.), https://bit.ly/3d8wUZ2.  In the month of April 2020 alone, more than 20 million Americans lost their jobs, driving the unemployment rate to 14.7 percent, the largest single-month increase ever recorded.  *See Economic News Release*, U.S. BUREAU OF LAB. STAT. (May 8, 2020 8:30 a.m. EST), https://bit.ly/2UGiOYr.  These losses reached people from all stations of life: the leisure and hospitality industry lost 7.7 million jobs (nearly half the industry), while the education and health services industry, the professional and business services industry, and the retail trade industry each shed more than 2 million jobs.  *Id.*

To alleviate the incredible economic devastation wrought by the pandemic, Congress passed the CARES Act in March 2020, and President Trump signed it into law on March 27, 2020. *See* Pub. L. 116-136, 134 Stat. 281 (2020).  The CARES Act was a $2.2 trillion stimulus package. As relevant here, § 2201(a) of the CARES Act, codified at 26 U.S.C. § 6428, harnessed the federal tax infrastructure to provide emergency financial assistance to American families, in the form of an advance refundable tax credit.  *See Economic Impact Payment Information Center*, INTERNAL REVENUE SERV. (July 15, 2020), https://bit.ly/2WEtZBO; *The CARES Act Provides Assistance to Workers and their Families*, U.S. DEP'T OF THE TREASURY, https://bit.ly/39gPGwE (last accessed July 20, 2020).

As mentioned, 26 U.S.C. § 6428(a) provides that an "eligible individual . . . shall be allowed" a "credit against the tax imposed" for the 2020 tax year in the amount of $1,200, or $2,400 "in the case of  eligible individuals filing a joint return."  26 U.S.C. § 6428(a)(1).[11]  Under § 6428(a)(2), an eligible individual also receives an additional $500 credit for each "qualifying child."  *See* 26 U.S.C. § 24(c).[12]  "Qualifying child" is defined with reference to 26 U.S.C. § 24(c), relating to the child tax credit, which itself references the definition in 26 U.S.C. § 152(c).  Of relevance here, a qualifying child is one under the age of seventeen.  *See* 26 U.S.C. § 24(c)(1). Receipt of this money "shall be treated" as a refundable credit, 26 U.S.C. § 6428(b).  This means that if the amount of the credit exceeds the recipient's tax liability, the taxpayer receives the excess as a refund.

---

[11] As indicated in Note 2, the amount of the credit decreases above certain adjusted gross income levels, depending on the individual's filing status.

[12] The other aspects of this definition are not at issue.

As noted, the CARES Act provides a credit against the tax imposed for the 2020 tax year, and the law primarily envisioned the distribution of the credit as an advance refund. In 26 U.S.C. § 6428(f)(1), it states: "[E]ach individual who was an eligible individual for such individual's first taxable year beginning in 2019 shall be treated as having made a payment against the tax imposed . . . for such taxable year in an amount equal to the advance refund amount for such taxable year." The advance refund amount is "the amount that would have been allowed as a credit under this section for such taxable year if this section . . . had applied to such taxable year." *Id*. § 6428(f)(2).[13]

The law's reconciliation provision provides that "[t]he amount of credit which would . . . be allowable under this section shall be reduced (but not below zero) by the aggregate refunds and credits made or allowed to the taxpayer under subsection (f)," which governs advance refunds. *Id*. § 6428(e). In other words, if a taxpayer receives an advance refund, she is not eligible to claim the CARES Act credit again on her 2020 tax return, unless she is due additional amounts she did not receive as part of her advance refund.

The CARES Act directed the Secretary of the Treasury to "refund or credit any overpayment attributable to" § 6428—that is, to issue advance refunds—"as rapidly as possible." *Id*. § 6428(f)(3)(A). But, it specified that "[n]o refund or credit shall be made or allowed" after December 31, 2020. *Id*. As of June 30, 2020, the Treasury Department reported that it had disbursed nearly 159 million payments, worth more than $267 billion, representing "all eligible

---

[13] The approach taken by the CARES Act in its advanced refunds is similar to the approach taken by a 2008 law providing stimulus payments, which was described by the Second Circuit as follows: "[U]nder the [Internal Revenue] Code, the IRS is authorized to credit any 'overpayment' that a taxpayer makes on her federal taxes against that taxpayer's liabilities, and 'refund any balance' to the taxpayer. . . . [I]n order 'to provide economic stimulus through recovery rebates to individuals,' the [2008 law] credits eligible taxpayers with a constructive overpayment of their taxes, and deems the stimulus credit to be a refund of this constructive overpayment." *Sarmiento v. United States*, 678 F.3d 147, 152-53 (2d Cir. 2012) (internal citations omitted).

Americans for whom the IRS has the necessary information to make a payment." *See Treasury, IRS Announce Delivery of 159 Million Economic Impact Payments*, U.S. DEP'T OF THE TREAS. (June 30, 2020), https://bit.ly/3CdMcd5.

Receipt of the CARES Act credit is contingent on the satisfaction of several prerequisites. First, the individual's income must fall below a statutory threshold.  26 U.S.C. § 6428(c).  Second, in order to qualify as an "eligible individual," the recipient cannot be either a "nonresident alien individual" or a dependent child.  *Id.* § 6428(d).  An individual can demonstrate compliance with these requirements in the 2020 calendar year, for the advance refund, using either a 2018 or 2019 tax return, or in the 2021 calendar year based on a 2020 tax return.  *See id.* § 6428(a), (f); *see also* ECF 66, ¶ 3.

Section 6428(g), as originally enacted in the CARES Act, contained additional limitations. Relevant here, § 6428(g)(1) (March 2020) provided:

**(g) Identification number requirement**

(1) **In general**—No credit shall be allowed under subsection (a) to an eligible individual who does not include on the return of tax for the taxable year—

(A) such individual's valid identification number,

(B) in the case of a joint return, the valid identification number of such individual's spouse . . . .

In turn, § 6428(g)(2) defined "valid identification number" as a Social Security Number issued to a citizen of the United States, a lawful permanent resident ("LPR"), or a noncitizen who is not a LPR but who has work authorization.  *See id.* § 6428(g)(2) (March 2020) (defining SSN in reference to 26 U.S.C. 24(h)(7)).[14]  This requirement was significant because undocumented

---

[14] The numbering of this provision was amended by the CAA, but the provision was not substantively altered.

immigrants are not eligible to obtain a SSN; they use an Individual Taxpayer Identification Number ("ITIN") issued by the IRS to file a tax return. *See* ECF 66, ¶¶ 30, 43-45; *see also* 20 C.F.R. § 422.104(a) (delineating the eligibility requirements to obtain a SSN). Therefore, §§ 6428(g)(1)(B) and (g)(2) operated in tandem to exclude otherwise eligible individuals and their children from receipt of impact payments if they file a joint tax return and if their spouse is undocumented and thus lacks a SSN.

According to plaintiff, this result was hardly an accident. ECF 66, ¶ 39. She points out that during the floor debates of the CARES Act, Congressman TJ Cox of California highlighted what he called the CARES Act's "'glaring shortcomings,'" which included that it "'punishes mixed-status households and denies some American citizens benefits they deserve.'" *Id.* (quoting 166 Cong. Rec. H1841 (daily ed. Mar. 27, 2020)). Moreover, although the original Senate version of the CARES Act required that all married joint filers possess SSNs in order to be eligible for impact payments, the Senate inserted an exception permitting families to receive the credit if one spouse lacked a SSN, so long as the other spouse was a member of the Armed Forces. *See* 26 U.S.C. § 6428(g)(3) (Mar. 27, 2020). Plaintiff claims that this exception "demonstrates that Congress was aware that impact payments would be generally unavailable to qualified individuals who are married to and jointly file their taxes with non-citizens who lack a [SSN]." ECF 66, ¶ 39.

Despite the passage of the CARES Act, the pandemic continued to exact a considerable economic toll. As a result, in December 2020, Congress passed the CAA, which contained a host of provisions designed to address the ongoing impact of COVID-19. *See* Emily Cochrane, *Congress Rushes to Pass Huge Coronavirus Relief Bill*, N.Y. Times (Dec. 21, 2020), https://nyti.ms/34QISrA. President Trump signed the CAA into law on December 27, 2020.

The CAA provided for an additional $600 in cash assistance to eligible Americans. *See* 26 U.S.C. § 6428A. Those payments are not at issue here. But, pertinent here, the CAA also amended § 6428, governing the original CARES Act payments, to remove the requirement that, for jointly filed tax returns, both individuals must have a SSN. ECF 66, ¶ 51. Section 6428(g)(1) of 26 U.S.C. now provides, in relevant part:

> **(g) Identification number requirement**
>
> (1) **In general**—Requirements for credit.—Subject to paragraph (2), with respect to the credit allowed under subsection (a), the following provisions shall apply:
>
>> (A) In general.—In the case of a return other than a joint return, the $1,200 amount in subsection (a)(1) shall be treated as being zero unless the taxpayer includes the valid identification number of the taxpayer on the return of tax for the taxable year.
>>
>> (B) Joint returns.—In the case of a joint return, the $2,400 amount in subsection (a)(1) shall be treated as being—
>>
>>> (i) $1,200 if the valid identification number of only 1 spouse is included on the return of tax for the taxable year, and
>>>
>>> (ii) zero if the valid identification number of neither spouse is so included. . . .

In other words, as a result of the CAA, an otherwise eligible individual who files a joint tax return, and whose spouse lacks a SSN, can now claim the CARES Act tax credit, albeit in the sum of $1,200 rather than $2,400. This eliminated a significant issue presented in the Amended Complaint.

However, newly eligible individuals are not in entirely the same position as other eligible individuals. Although citizens whose spouses lack a SSN are themselves eligible for the CARES Act tax credit, pursuant to the CAA, the CAA did not make them eligible to receive advance refunds of that credit. Instead, the CAA refashioned the original SSN eligibility provision of § 6428(g) to limit eligibility for advance refunds. Section 6428(g)(2) provides:

(1) **Requirements for advance refunds**.—No refund shall be payable under subsection (f) to an eligible individual who does not include on the return of tax for the taxable year—

> (A) such individual's valid identification number,
>
> (B) in the case of a joint return, the valid identification number of such individual's spouse . . . .

Furthermore, the CAA left unaltered the provision of 26 U.S.C. § 6428, providing that "[n]o refund or credit shall be made or allowed . . . after December 31, 2020." 26 U.S.C. § 6428(f)(1). This means that newly eligible individuals must claim their CARES Act credits on their 2020 federal tax returns, completed in calendar year 2021. ECF 66, ¶¶ 2, 3, 52. Therefore, newly eligible individuals must do so on the basis of the information on their 2020 tax returns. *See* ECF 66, ¶¶ 51-54. In contrast, the advance refund under § 6428 is based on the information in the filer's 2018 or 2019 tax return. *See* 26 U.S.C. §§ 6428(f)(1), (5).

For many newly eligible individuals—including most of the original plaintiffs in this litigation—this distinction does not impact the amount they receive from the CARES Act credit. Indeed, 15 of the 16 original plaintiffs concluded that, in light of the CAA, "their claims in the case are resolved." ECF 68, ¶ 1. But, for some newly eligible individuals, their 2020 tax returns are materially different from their 2019 or 2018 tax returns. As a result, basing the CARES Act credit on their 2020 tax returns results in a smaller payment, as compared to what they might have received had they been eligible for an advance refund when the CARES Act was first enacted.

This, according to the SAC, is the situation for Rueda. As noted, plaintiff is a U.S. citizen with a SSN, but her spouse does not have a SSN. ECF 66, ¶¶ 4, 9. She files her taxes jointly with her spouse, which she considers "part of married life." *Id.* ¶ 56. Rueda alleges that she "files her tax returns to express her family union to the government and society. [Her] desire to file her taxes jointly is an expression of her marriage and the unity of her family, in addition to securing the

benefits available to spouses who file jointly." *Id*.  She also asserts that filing her taxes jointly with her spouse assists her "in the immigration petitioning process for her spouse." *Id*.

Because plaintiff's spouse lacks a SSN, however, plaintiff was not eligible for the CARES Act credit prior to the enactment of the CAA.  And, even after the passage of the CAA, she was not eligible to receive the advance refund.  *Id*. ¶¶ 4, 32, 33.  Instead, she had to claim the CARES Act credit on her 2020 tax return.  *Id*. ¶¶ 5, 54.

Prior to 2020, plaintiff had three "qualifying children" who were all under the age of 17. *Id*. ¶¶ 4-6, 25.  Had she been eligible for an advance refund, which would have been calculated based on her 2019 or 2018 tax return, she would have received a $500 credit for each child.  *Id*. ¶¶ 6, 52, 55.  But, one child turned 17 in 2020.  *Id*. ¶ 5.  And, as a newly eligible individual, she had to claim the CARES Act credit on her 2020 tax return.  By then, her son had turned 17, and so is no longer a qualifying child.  *Id*.  As plaintiff alleges, she cannot receive the $500 credit that she would have received had she been eligible for the advance refund when the CARES Act was first enacted.  *Id*. ¶¶ 6, 54.

The SAC contains three causes of action.  First, plaintiff alleges that defendants' enforcement of 26 U.S.C. § 6428(g)(1)(B), § 6428(f)(1)-(2), and § 6428(f)(3)(A) "intentionally and substantially infringes upon" her "fundamental right to marriage and to choose how to define her family," in violation of the Due Process Clause of the Fifth Amendment.  ECF 66, ¶ 74. Second, plaintiff asserts that defendants' enforcement of 26 U.S.C. § 6428(g)(1)(B), § 6428(f)(1)-(2), and § 6428(f)(3)(A) violates her "right to freedom of speech and association guaranteed by the First Amendment by denying her a tax credit because she expresses her lawful marriage and commitment to, and association with, her spouse in their most recent jointly-filed federal tax returns."  ECF 66, ¶ 80.  Third, plaintiff claims that defendants' enforcement of 26 U.S.C.

§ 6428(g)(1)(B), § 6428(f)(1)-(2), and § 6428(f)(3)(A) violates the equal protection component of the Fifth Amendment because it treats her "differently than other married couples simply because her spouse lacks a social security number" and denies her a "benefit[] of marriage afforded to other married couples." ECF 66, ¶ 87.

Plaintiff seeks a declaration that "the deprivation of a tax credit to tax filers whose otherwise qualifying children reached the age of 17 years in 2020 under 26 U.S.C. § 6428(g)(2)(B), 26 U.S.C. §§ 6428(f)(1)-(2), and 26 U.S.C. § 6428(f)(3)(A) is unconstitutional and unenforceable." ECF 66 at 21. Furthermore, she asks the Court to enjoin defendants "from depriving a tax credit to tax filers whose otherwise qualifying children reached the age of 17 years in 2020 and further enjoin Defendants from otherwise denying Plaintiff Rueda and other similarly-situated individuals a tax credit for their children who reached the age of 17 years under 26 U.S.C. § 6428(g)(2)(B), 26 U.S.C. §§ 6428(f)(1)-(2), and 26 U.S.C. § 6428(f)(3)(A)." ECF 66 at 21.

Additionally, plaintiff seeks to certify a nationwide class under Fed. R. Civ. P. 23(b). *See* ECF 66, ¶¶ 61-69. She describes the class as follows: "All persons who are otherwise qualified for and would have received an advance refund of the tax credits for themselves and their eligible children but for the fact that they were excluded by 26 U.S.C. § 6428(g)(2)(B) because their spouses lack social security numbers, and where neither the person nor the spouse was a member of the Armed Forces of the United States at any time during the taxable year, and their otherwise eligible children reached the age of 17 years in 2020." ECF 66, ¶ 62.

## II.      Standards of Review

### A.  Rule 12(b)(1)

Federal district courts are courts of limited jurisdiction; they possess "'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 586 U.S. 251, 256 (2013) (quoting

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see Home Depot U.S.A., Inc. v. Jackson*, ___ U.S. ___, 139 S. Ct. 1743, 1746 (2019); *Exxon Mobil Corp. v. Allapattah Servs., Inc*., 545 U.S. 546, 552 (2005). Simply put, "if Congress has not empowered the federal judiciary to hear a matter, then the case must be dismissed." *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'") (citation omitted). "Because jurisdictional limits define the very foundation of judicial authority, subject matter jurisdiction must, when questioned, be decided before any other matter." *United States v. Wilson*, 699 F.3d 789, 793 (4th Cir.2012).

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to challenge the court's subject matter jurisdiction over the plaintiff's suit. Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc*., 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty*., 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999). However, a court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *B.F. Perkins*, 166 F.3d at 647 (citation omitted).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *accord Hutton v. Nat'l Bd. of Exam'rs Inc*., 892 F.3d 613, 620-21 (4th Cir. 2018). Here, the Government raises a facial challenge to the Court's subject matter jurisdiction, asserting

15

that the doctrine of sovereign immunity forecloses plaintiffs' claims.  ECF 73-1 at 9-15; *see Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (observing that "'sovereign immunity deprives federal courts of jurisdiction to hear claims'") (citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. (2018).  In such a case, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated."  *Hutton*, 892 F.3d at 621 n.7; *see Kerns*, 585 F.3d at 192.

### B.  Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304-05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration

in *Retfalvi*) (quoting  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"  *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'"  *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

### III.     Discussion

The Government moves to dismiss the SAC on two grounds: subject matter jurisdiction and failure to state a claim.  As to the first ground, the Government argues that the Anti-Injunction Act ("AIA"), together with the Declaratory Judgment Act ("DJA"), prohibit the suit, thereby depriving the Court of subject matter jurisdiction.  ECF 73-1 at 9-15.  And, as to the second ground, the Government argues that each of plaintiff's constitutional claims fails as a matter of law.  *Id*. at 16-24.

Two other district courts of which I am aware have considered 26 U.S.C. § 6428 in related cases.  In this Court, Judge Grimm granted summary judgment in favor of the Government in a challenge to § 6428.  *See R.V. v. Mnuchin*, ___ F. Supp. 3d ___, 2021 WL 5140202 (D. Md. Nov. 4, 2021).[15]  However, *R.V.* concerned a challenge by U.S. citizen children whose parents were undocumented and thus were excluded from the CARES Act credit entirely, under either version of § 6428.  *Id*. at *1.  And, Judge Stephen Wilson of the Central District of California denied plaintiffs' motion for a temporary restraining order in a challenge to the original version of § 6428, similar to that lodged in the first version of this lawsuit.  *See Doe v. Trump*, Case No. 8:20-cv-858-SVW, 2020 WL 5076999 (C.D. Cal. July 8, 2020).  He then granted the Government's motion to dismiss.  *See Doe v. Trump*, Case No. 8:20-cv-858-SVW, 2020 WL 5492994 (C.D. Cal. Sept. 2, 2020), *appeal voluntarily dismissed*, 2021 WL 1238571 (2d Cir. Jan 12, 2021).  However, these cases involved claims, arguments, or procedural postures distinct from what is now at issue in this case.

---

[15] Judge Grimm had denied the Government's motion to dismiss.  *See R.V. v. Mnuchin*, PWG-20-1148, 2020 WL 3402300 (D. Md. June 19, 2020).

In my view, the AIA and the DJA bar the current suit.  Because this conclusion requires

dismissal of the case, I do not consider the Government's arguments under Rule 12(b)(6).

### A.

The Government argues that plaintiff's suit "would have the effect of restraining the

assessment and collection of her 2020 income taxes."  ECF 73-1 at 11.  Therefore, the government

contends that the suit is prohibited by the AIA and DJA, and thus that Rule 12(b)(1) mandates

dismissal.

The Anti-Injunction Act was originally enacted in 1867, and is currently codified at 26

U.S.C. § 7421(a).  *See CIC Services, LLC v. Internal Revenue Service*, ___ U.S. ___, 141 S. Ct.

1582, 1586 (2021) ("*CIC*").  The AIA states, in relevant part: "[N]o suit for the purpose of

restraining the assessment or collection of any tax shall be maintained in any court by any person,

whether or not such person is the person against whom such tax was assessed."  26 U.S.C. §

7421(a).

The AIA "has two primary objectives: 'efficient and expeditious collection of taxes with a

minimum of preenforcement judicial interference, and protection of the collector from litigation

pending a refund suit.'"  *Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 299 (4th Cir. 2000) (quoting

*United States v. Am. Friends Serv. Comm.*, 419 U.S. 7, 12 (1974) (per curiam)); *see also Nat'l

Federation of Independent Businesses v. Sebelius*, 567 U.S. 519, 543 (2012) (stating that the AIA

"protects the Government's ability to collect a consistent stream of revenue, by barring litigation

to enjoin or otherwise obstruct the collection of taxes"); *Bob Jones Univ. v. Simon*, 416 U.S. 725,

736 (1974) ("The Court has interpreted the principal purpose of [the AIA] to be the protection of

the Government's need to assess and collect taxes as expeditiously as possible with a minimum of

preenforcement judicial interference, 'and to require that the legal right to the disputed sums be

determined in a suit for refund.'") (quoting *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7 (1962)). Moreover, the AIA "applies broadly to include activities that are intended to or may culminate in the assessment or collection of taxes." *Judicial Watch*, 317 F.3d at 405. "Regardless of how the claim is labelled," when "the effect of an injunction . . . is to interfere with the assessment or collection of a tax," the AIA stands as an obstacle. *Int'l Lotto Fund v. Va. State Lottery Dep't*, 20 F.3d 589, 591 (4th Cir. 1994).

The AIA "applies whenever a suit calls for enjoining the IRS's assessment and collection of taxes—of whatever kind." *CIC*, 141 S. Ct. at 1594. "The AIA has 'almost literal effect': It prohibits only those suits seeking to restrain the assessment or collection of taxes." *Cohen v. United States*, 650 F.3d 717, 724-25 (D.C. Cir. 2011) (quoting *Bob Jones*, 416 U.S. at 737).

Under the AIA, "a person can typically challenge a federal tax only after he pays it, by suing for a refund." *CIC*, 141 S. Ct. at 1586. If a suit's purpose falls within those barred by the AIA, it must be dismissed. *Id.* at 1588. "The effect of the Act is simple and obvious: courts lack jurisdiction to issue injunctive relief in suits seeking to restrain the assessment or collection of taxes." *Judicial Watch, Inc. v. Rossotti*, 317 F.3d 401, 405 (4th Cir. 2003), *cert. denied*, 540 U.S. 825 (2013).

To be sure, there are various statutory exceptions to the AIA. But, they are not at issue here. *See* 26 U.S.C. § 7421. And, there are two narrow, judicially-created exceptions to the AIA, discussed, *infra*.

For its part, and with exceptions not relevant here, the DJA "authorizes all United States courts to issue declaratory relief in cases within their jurisdiction 'except with respect to Federal taxes.'" *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 582 (4th Cir. 1996) (quoting 22 U.S.C. § 2201(a)). The Fourth Circuit has said: "Though the Anti–Injunction Act concerns federal courts'

subject matter jurisdiction and the tax-exclusion provision of the Declaratory Judgment Act concerns the issuance of a particular remedy, the two statutory texts are, in underlying intent and practical effect, coextensive." *Id*. at 583. "In light of the two provisions' coextensive nature, a finding that one of the two statutes does not bar [suit or relief] will necessitate a finding that the other statute does not pose an obstacle either." *Id*. at 584. The parties agree that the DJA is coextensive with the AIA. ECF 73-1 at 10; ECF 74 at 3. They focus their arguments on the AIA.

Of relevance here, on May 17, 2021, the Supreme Court decided *CIC Services, LLC, v. Internal Revenue Service*, 141 S. Ct. 1582 (2021) ("*CIC*"), five days after the Government filed its Motion on May 12, 2021. In *CIC*, the Supreme Court extensively discussed the AIA and the circumstances in which it is applicable.

In particular, in *CIC* the Court considered whether the AIA prohibits a pre-enforcement challenge under the Administrative Procedure Act ("APA") to an IRS information-reporting requirement, for which noncompliance may result in civil tax penalties as well as criminal penalties. *See id*. at 1586-88. The "criminal liability is not 'deemed' a tax." *Id.* at 1588. Nor does a reporting requirement constitute a tax. *Id.* The Sixth Circuit concluded that the suit was barred by the AIA, because invalidating the reporting requirement would "restrain (indeed eliminate)" the tax penalty for noncompliance. *CIC*, 925 F.3d 247, 255 (6th Cir. 2019).

The Supreme Court disagreed in a unanimous decision.[16] It held that the AIA did not bar the pre-enforcement challenge to the IRS reporting requirement under the APA. *See* 141 S. Ct. at 1594.

---

[16] Justices Sotomayor and Kavanaugh filed brief concurring opinions.

The Court explained the proper approach to the question of whether a suit has a "purpose" foreclosed by the AIA.  *Id*. at 1589.  It said, *id*. at 1589-90 (internal citations omitted; alterations in *CIC*):

> In considering a "suit['s] purpose," we inquire not into a taxpayer's subjective motive, but into the action's objective aim—essentially, the relief the suit requests. . . .  The purpose of a measure is "the end or aim to which [it] is directed."  And in this context, that aim is not best assessed by probing an individual taxpayer's innermost reasons for suing.  Down that path lies too much potential for circumventing the Act.  Instead, this Court has looked to the face of the taxpayer's complaint.  We have asked about what the Government here calls "the substance of the suit"—the claims brought and injuries alleged—to determine the suit's object.  And most especially, we have looked to the "relief requested"—the thing sought to be enjoined.  The Anti-Injunction Act kicks in when the target of a requested injunction is a tax obligation—or stated in the Act's language, when that injunction runs against the "collection or assessment of [a] tax."

Analyzing the complaint in *CIC*, the Supreme Court agreed with the plaintiff that the suit contested the legality of the reporting requirement, not the tax that served as one way to enforce it.  The Court observed, *id*. at 1590: "CIC's complaint asks for injunctive relief from the Notice's reporting rules, not from any impending or eventual tax obligation."    Indeed, the reporting rule was "several steps removed" from any tax.  *Id*. at 1591.  It involved separate obligations, and was enforceable by criminal as well as tax penalties.

The Court rejected the Government's claim that the suit was "a tax action in disguise," or an effort to evade the AIA "through artful pleading."  *Id*. at 1590.  Rather, the suit "target[ed]" the reporting rule.  *Id*. at 1592.  Responding to the Government's concern that the decision would lead to a "wave" of pre-enforcement actions against taxes, the Court remarked, *id*. at 1593: "[T]he kind of case the Government invokes in making its floodgates claim is a conflict over taxes, whether on earning income, or selling stock, or entering into a business transaction. In such a case, the legal rule at issue is a tax provision. . . . If the dispute is about a tax rule—as it is in the run-of-the-mine

suits the Government raises—the sole recourse is to pay the tax and seek a refund."  But, in *CIC* "the injunction . . . does not run against a tax at all."  *Id.*

Notably, the presence of constitutional claims does not affect the AIA's preclusive force. *Alexander v. Americans United Inc.*, 416 U.S. 752, 758-59 (1974) (holding that "the constitutional nature of a taxpayer's claim, as distinct from its probability of success, is of no consequence under the Anti-Injunction Act").  Several other cases illustrate the application of the AIA.

In *Bob Jones University*, 416 U.S. 725, as well as *Alexander v. Americans United Inc.*, 416 U.S. 752, the Supreme Court concluded that the AIA precluded pre-enforcement challenges to IRS decisions to rescind the tax exempt status of the plaintiff organizations.  In both cases, "the suits sought to prevent the levying of taxes, and so could not go forward."  *CIC*, 141 S. Ct. at 1593. Specifically, the suits aimed to "restrain the assessment and collection of taxes from [the organizations'] contributors."  *Alexander*, 416 U.S. at 762; *see also Bob Jones*, 416 U.S. at 739. This brought them within the ambit of the AIA.  And, this was so even though the suits sought to "lower the taxes of those other than" the organizations themselves, namely of their donors.  *Bob Jones*, 416 U.S. at 739.

In *Judicial Watch*, 317 F.3d at 405, the Fourth Circuit ruled that the AIA barred a suit challenging "an audit to determine tax liability."  And, in *Int'l Lotto Fund*, 20 F.3d at 590, the Fourth Circuit determined that the AIA prohibits "enjoining the Virginia State Lottery Department's withholding of federal and state income taxes from a foreign enterprise's lottery winnings."  The Court reasoned that the "withholding framework" fell within the ambit of collection, and an injunction would disrupt the government's "'taxing ability.'"  *Id.* at 591 (citation omitted).

On the other hand, in *CIC*, 141 S. Ct. at 1590-94, the Supreme Court held the AIA inapplicable to an APA challenge to an IRS information-reporting requirement.  And, in *Hibbs v. Winn*, 542 U.S. 88, 93 (2004), the Supreme Court ruled that the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, did not prohibit an Establishment Clause suit as to an Arizona tax credit for private school scholarships, given that the plaintiffs did not "contest their own liability" nor "seek to impede Arizona's receipt of tax revenues."[17]  And, in *Cohen*, 650 F.3d at 724-27, the D.C. Circuit concluded that the AIA did not bar an APA challenge to IRS procedures establishing a one-time mechanism for the refund of erroneously collected excise taxes.

Section 7422 of 26 U.S.C., for its part, is a complementary provision to the AIA that permits tax refund suits against the IRS.  Section 7422(a) provides:

> (a) **No suit prior to filing claim for refund**.—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

By otherwise barring suit, the AIA channels litigation over tax liability into post-payment suits for refunds under § 7422.  *Sebelius*, 567 U.S. at 543 (citing *Williams Packing*, 370 U.S. at 7-8); *see also Bob Jones*, 416 U.S. at 736 (stating that, unless a statutory exception to the AIA applies, "the legal right to the disputed [sums] must be determined in a suit for a refund").  The purpose of this scheme is to "'advise the appropriate officials of the demands or claims intended to be asserted, so as to insure an orderly administration of the revenue,' to provide that refund

---

[17] The Tax Injunction Act, 28 U.S.C. § 1341, provides: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." The TIA was modeled on the AIA, and the Supreme Court "assume[s] that words used in both Acts are generally used in the same way." *Direct Marketing Ass'n v. Brohl*, 575 U.S. 1, 8 (2015).

claims are made promptly, and to allow the IRS to avoid unnecessary litigation by correcting conceded errors." *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 11 (2008) (quoting *United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269, 272 (1931)). But, "Section 7422(a) does not allow for prospective relief." *King v. Burwell*, 759 F.3d 358, 367 (4th Cir. 2014), *aff'd*, 576 U.S. 473 (2015); *see also Cohen*, 650 F.3d at 732 (Section 7422(a) "does not, at least explicitly, allow for prospective relief.").

In *Amador*, the Court was not squarely confronted with the AIA. However, the Court did address 26 U.S.C. § 7422 and, in doing so, covered related terrain.

The original plaintiffs in *Amador* asserted that the APA, 5 U.S.C. § 702, waived sovereign immunity for the suit. ECF 43 at 12-13. However, the APA, 5 U.S.C. § 704, only authorizes review when "there is no other adequate remedy in a court," and the Government argued that § 7422 provided this alternative, adequate remedy. ECF 43 at 13-14. I rejected this argument, performing the traditional analysis as to what constitutes an "adequate remedy" for the purposes of § 704. *Id*. at 14-19.

For example, I concluded that § 7422 would be too arduous of a process under the "adequate remedy" case law. *Id*. at 17-18. At the time, the case could not be "characterized as a tax refund action" under § 7422, because plaintiffs did not "'complain[] of the manner in which a tax was assessed or collected,'" nor did they "seek 'reimbursement for wrongly paid sums.'" *Id*. at 17 (quoting *King*, 759 F.3d at 367) (alteration in *King*). In reaching this conclusion, I relied on *King*, 759 F.3d at 366-67, in which the Fourth Circuit concluded that § 7422 was not an adequate remedy for an APA challenge to IRS rulemaking implementing a provision of the Affordable Care Act.

Moreover, both *R.V.* and *Doe* rejected arguments by the Government as to the original version of 26 U.S.C. § 6428, in which it claimed that a statutory challenge had to proceed under § 7422. *See Doe*, 2020 WL 5076999, at *5 (concluding that § 7422 did not apply because "[p]laintiff is seeking a benefit that has been denied to her by what she alleges to be unconstitutionally unequal treatment, rather than a refund of a tax imposed upon her"); *R.V.*, 2020 WL 3402300, at *7 ("By its plain language, § 7422(a) does not apply here because it is not a suit for any tax, penalty, or sum wrongfully collected.").

## B.

In the present posture of this case, the Motion squarely presents the issue of the applicability of the AIA. And, in view of the relief requested by the SAC and the case law discussed above, particularly the Supreme Court's decision in *CIC*, I conclude that the AIA (and thus the DJA) bar the suit.

As the Supreme Court observed in *CIC*, 141 S. Ct. at 1589, in determining whether a plaintiff's suit falls within the ambit of the AIA, it has "looked to the face of the taxpayer's complaint." And, in particular, it looks to the "'relief requested'—the thing sought to be enjoined." *Id.* at 1590 (citation omitted). The AIA "kicks in when the target of a requested injunction is a tax obligation." *Id.*

The SAC (ECF 66 at 21) seeks the following declaratory and injunctive relief:

(a) Declare that the deprivation of a tax credit to tax filers whose otherwise qualifying children reached the age of 17 years in 2020 under 26 U.S.C. § 6428(g)(2)(B), 26 U.S.C. §§ 6428(f)(1)-(2), and 26 U.S.C. § 6428(f)(3)(A) is unconstitutional and unenforceable because it violates the First Amendment to the U.S. Constitution and the Due Process and Equal Protection guarantees of the Fifth Amendment to the U.S. Constitution;

(b) Enjoin Defendants and their agents from depriving a tax credit to tax filers whose otherwise qualifying children reached the age of 17 years in 2020 and further enjoin Defendants from otherwise denying Plaintiff Rueda and other similarly-

situated individuals a tax credit for their children who reached the age of 17 years under 26 U.S.C. § 6428(g)(2)(B), 26 U.S.C. §§ 6428(f)(1)-(2), and 26 U.S.C. § 6428(f)(3)(A) . . . .

In other words, the SAC requests a declaration of unconstitutionality as to the denial of a tax credit to newly eligible individuals in plaintiff's situation, with children who reached the age of 17 in 2020. And, the SAC seeks to require the Government to provide the tax credit to plaintiff, and others similarly situated, because when the CARES Act was first enacted, their children were qualified by age, and if they had been eligible for the advance refund when the statute was initially enacted, their children would not have aged out from the benefit. In the case of plaintiff, this would have resulted in the receipt of an additional $500 in CARES Act tax credit. *See id.* ¶¶ 53-55.

The relief requested in the SAC is a straightforward effort to obtain the CARES Act tax credit via injunctive relief. It seeks to enjoin defendants from "depriving a tax credit" to certain filers, and from "denying" the tax credit to plaintiff and others similarly situated. ECF at 21. In short, plaintiff seeks to obtain an award of $500. In contrast, the sixteen plaintiffs who filed the First Amended Complaint sought to enjoin defendants from enforcing 26 U.S.C. § 6428(g)(1)(B) (March 2020), which at the time excluded individuals whose spouses lacked SSNs from receiving the credit. ECF 31 at 20. They also sought to enjoin defendants from requiring plaintiffs to provide SSNs for their spouses in order to receive the tax credit. *Id.*

The Government contends that such an injunction effectively operates as a restraint on its tax collection, and thus the suit is impermissible under the AIA. ECF 73-1 at 9-11; ECF 75 at 2-6. Although the Government sometimes generically describes plaintiff's requested relief as restraining the "assessment or collection" of a tax, it appears to argue that the requested relief restrains collection, not assessment. *See* ECF 73-1 at 10-11 ("Accordingly, a suit like this one –

28

seeking a declaratory judgment or injunction with regard to a credit – is construed as challenging the collection of tax."); *id*. at 12 ("[N]o matter how Rueda phrases her demand, the injunction she seeks would prevent the IRS from collecting tax and would require it to issue her an additional $500 tax credit on account of her 17-year-old son."); ECF 75 at 4 ("That this case considers an injunction that may restrain the IRS from collecting, *rather than assessing*, tax is of no consequence.") (emphasis added).

To be sure, the tax provision in question provides a credit to the taxpayer; it does not impose a tax payment obligation on the taxpayer.  But, the core of the Government's argument is that a suit "seeking a declaratory judgment or injunction with regard to a credit" is "construed as challenging the collection of a tax," bringing the suit under the umbrella of the AIA.  ECF 73-1 at 10-11.

Both sides appear to agree (ECF 73-1 at 10; ECF 74 at 6; ECF 75 at 4) that refundable tax credits, such as the CARES Act credit, are regarded as "overpayments" under the Internal Revenue Code (the "Code").  *See* 26 U.S.C. § 6401(b)(1) (providing that if the amount allowable as renewable credits exceeds the income tax imposed, the excess amount shall be considered an overpayment).  And, such payments are refundable, pursuant to 26 U.S.C. § 6402(a).  It provides that the Secretary "may credit the amount of . . . overpayment . . . against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall . . . refund any balance to such person."  *See, e.g.*, *Sorenson v. Sec'y of Treas.*, 475 U.S. 851, 859 (1986) ("An individual can receive the amount by which his entitlement to [the refundable] earned-income credit exceeds his tax liability only because § 6401(b) of the Code defines that amount as an 'overpayment,' and § 6402 provides a mechanism for disbursing overpayments, namely, the income tax refund process. The refundability of the earned-income credit is thus inseparable from

its classification as an overpayment of tax."); *Sarmiento v. United States*, 678 F.3d 147, 152-53 (2d Cir. 2012) (describing this system); *R. Edwin Brown, P.A. v. United States*, H-90-2043, 1991 WL 288907, at *4 (D. Md. Sept. 27, 1991) ("[T]he Code permits the IRS to credit the amount of any overpayment against any liability with respect to any tax due and owing by the taxpayer.").

Thus, a refundable tax credit, such as the CARES Act credit, when claimed on a taxpayer's 2020 tax return, reduces the amount of taxes owed. And, if the credit is greater than the amount of taxes owed, the balance of the credit is refunded to the taxpayer. *See also Recovery Rebate Credit*, INTERNAL REVENUE SERV. (last visited Feb. 9, 2022), https://bit.ly/3gDHkns ("Your Recovery Rebate Credit [*i.e.*, the CARES Act credit] on your 2020 tax return will reduce the amount of tax you owe for 2020 or be included in your tax refund.").

In other words, taxes and tax credits are two sides of the same coin. A refundable tax credit reduces the amount of taxes owed by a taxpayer, but it may also result in the Government issuing a refund to the taxpayer. Both a suit contesting the amount of taxes owed, and a suit contesting the denial of a refundable tax credit, stake a claim to the public fisc. *Cf. Ass'n of Am. Physicians and Surgeons, Inc. v. Koskinen*, 768 F.3d 640, 642 (7th Cir. 2014) (Easterbrook, J.) (noting that tax subsidies are "taxes in reverse").

The Court has not uncovered much case law addressing the interaction of the AIA and refundable tax credits. But, given the operation of refundable tax credits in practice, it seems logical to consider a suit aimed at challenging the denial of a tax credit in the same light as a suit challenging a tax. A suit contesting denial of a tax credit, like a suit contesting taxes owed, implicates the AIA's purpose—to "protect[] the Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct the collection of taxes." *NFIB*, 567 U.S at 543.

In *Hibbs v. Winn*, 542 U.S. at 92, the Supreme Court ruled that an Establishment Clause suit concerning an Arizona tax credit for organizations providing scholarships for private school students could proceed notwithstanding the TIA.  As noted, the TIA was modeled on the AIA, and the Supreme Court "assume[s] that words used in both Acts are generally used in the same way." *Direct Marketing Ass'n*, 575 U.S. at 8.  Crucial to the Supreme Court's decision in *Hibbs* was that the plaintiffs in *Hibbs* were third parties who sought, by striking down the tax credit in question, to "enlarge state receipts."  542 U.S. at 108.  They did not "contest their own liability," nor "seek to impede Arizona's receipt of tax revenues."  *Id*. at 93.

In *LaBorde v. City of Gahanna*, 946 F. Supp. 2d 725 (S.D. Ohio 2013), the court blocked a suit to enjoin use of a city tax form that allegedly calculated a tax credit incorrectly, to the detriment of plaintiffs.  *Id*. at 728, 734-36.  Applying *Hibbs*, the court held that the TIA precluded plaintiffs' attempt to enjoin the "incorrect calculation of a tax credit" . . . "and the *collection of taxes* that would result from the continued utilization" of the allegedly incorrect form.  *Id*. at 735 (emphasis added).  The situation here is far afield from that in *Hibbs*, and closer to the one in *LaBorde*: plaintiff is a directly affected taxpayer who seeks to enjoin the Government from depriving her, and others like her, from tax credits.  More broadly, the case law discussed earlier roundly supports the conclusion that the relief requested by plaintiff—an injunction directing the provision of a tax credit—falls within the scope of the AIA.

As noted, the AIA "kicks in when the target of a requested injunction is a tax obligation." *CIC*, 141 S. Ct. at 1590.  Here, the requested injunction targets plaintiff's tax obligations, namely the requirement that she pay her taxes without receiving the additional $500 CARES Act credit. In other words, the suit "asks for injunctive relief from . . . [an] impending or eventual tax obligation."  *Id*. at 1590.  "[T]he legal rule at issue" in this case "is a tax provision," § 6428, and

"[i]f the dispute is about a tax rule . . . the sole recourse is to pay the tax and seek a refund." *Id*. at 1593. "[T]here is no target for an injunction other than the command to pay the tax; there is no non-tax legal obligation to restrain." *Id*.

The distinctions between the IRS reporting requirement challenged in *CIC* and the provision challenged in this suit make clear why application of the AIA is appropriate here. As discussed, in rejecting the application of the AIA in *CIC*, the Supreme Court recognized that the suit attacked the reporting requirement, not "the separate statutory tax," and it sought injunctive relief only from that requirement. *Id*. at 1590. Significantly, the IRS requirement "impose[d] affirmative reporting obligations, inflicting costs separate and apart" from the tax, was "several steps removed" from the tax penalty for noncompliance, and was "backed up" not only by a statutory tax penalty but also by criminal penalties. *Id*. at 1589. "[T]he criminal penalties . . . practically necessitate a pre-enforcement, rather than a refund, suit—if there is to be a suit at all." *Id*. at 1592. By contrast, the SAC attacks the tax credit structure in § 6428 directly, seeking an injunction against that structure. *See* ECF 66 at 21. It does not attack an affirmative requirement that is "several steps removed" from the scheme. Furthermore, nothing in § 6428 involves criminal penalties.

As in *Bob Jones University*, 416 U.S. 725, and *Alexander*, 416 U.S. 752, this suit seeks to "prevent the levying of taxes," *CIC*, 141 S. Ct. at 1593, in the form of the tax obligation that would be reduced if the credit sought by plaintiff were applied. And, as the Fourth Circuit has stated, "the [AIA] applies broadly to include activities that are intended to or may culminate in the assessment or collection of taxes," of which the receipt of refundable tax credits certainly qualifies. *Judicial Watch*, 317 F.3d at 405. "Regardless of how the claim is labelled," when "the effect of an injunction . . . is to interfere with the assessment or collection of a tax," the AIA precludes suit.

*Int'l Lotto Fund*, 20 F.3d at 591.  Plaintiff "is not free 'to define the relief [she] seeks in terms permitted by the Anti–Injunction Act' while 'ignor[ing] the ultimate deleterious effect such relief would have on the Government's taxing ability.'"  *Id*. at 591 (quoting *Educo, Inc. v. Alexander*, 557 F.2d 617, 620 (7th Cir.1977)) (first alteration mine; second in *Int'l Lotto Fund*).

Plaintiff's arguments in response to the Government are not convincing.  *See* ECF 74 at 2-6.  Plaintiff quotes the Court's decision in *Amador*, declining to consider the initial suit as a refund action.  *Id*. at 3 (quoting ECF 43 at 17).  But, crucial differences now abound.  For one, in *Amador* the application of the AIA was not squarely presented or briefed.  The Government's initial submission mentioned the AIA and the DJA in one footnote, but neither party pursued this issue further.  *See* ECF 32 at 3 n.1.  The question before the Court was whether 26 U.S.C. § 7422 was an "adequate remedy" in court within the meaning of APA § 704.  *See* ECF 43 at 14.  And, whether a suit is for "the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected," § 7422(a), is certainly a different question from whether its purpose is "restraining the assessment or collection of any tax."  *See* § 7421(a).  Furthermore, as noted, the circumstances presented in the SAC are different from what was presented in the First Amended Complaint, and the requested relief likewise differs.

*King*, 759 F.3d at 366-67; *R.V.*, 2020 WL 3402300, at *7; and *Doe*, 2020 WL 5076999, at *5-6, likewise concerned 26 U.S.C. § 7422.  Thus, the cases are distinguishable.  In *King*, 759 F.3d at 366, for example, the Fourth Circuit explicitly noted that the Government did not invoke § 7422 as a "jurisdictional bar," but instead merely cited equitable principles disfavoring injunctions against taxes when other adequate remedies existed.

Plaintiff attempts to distinguish *Bob Jones* and *Alexander*, but her attempt to do so is unavailing.  First, she argues that the cases were confined to injunctive efforts to limit future tax

liability, *i.e.*, tax assessment.  However, as the Supreme Court explained in *CIC*, 141 S. Ct. at 1593, *Bob Jones* and *Alexander* broadly "sought to prevent the levying of taxes, and so could not go forward."  The same principle applies here.  Second, plaintiff contends that *Bob Jones* and *Alexander* "are also different because the case involved an across-the-board rule and not a rule that targets one type of taxpayer for different treatment," as she asserts is the case here.  ECF 74 at 4.  But, there is no case law supporting the proposition that the applicability of the AIA turns on this factor.  Indeed, as *Alexander* made clear, 416 U.S. at 758-59, "the constitutional nature of a taxpayer's claim . . . is of no consequence under the Anti-Injunction Act."

Plaintiff also attempts to differentiate this case on the ground that she actually challenges a "procedure" or "process" by which 26 U.S.C. § 6428 applies to her.  In her view, this makes a difference in regard to the AIA analysis.  ECF 74 at 5-6.  But, this contention is not persuasive.  Plaintiff challenges (as she acknowledges, *id*. at 5) the statutory tax credit scheme established by Congress in § 6428.  Thus, "the dispute is about a tax rule."  *CIC*, 141 S. Ct. at 1593.

Moreover, the cases cited by plaintiff are inapposite.  For example, *Cohen*, 650 F.3d 717, concerned substantive and procedural challenges to a mechanism established by the IRS to refund the proceeds of an excise tax that had previously been found illegal.  *Id*. at 719-22.  The D.C. Circuit remarked: "The IRS previously assessed and collected the excise tax at issue.  The money is in the U.S. treasury; the legal right to it has been previously determined. . . . This suit is strictly about the procedures under which the IRS will return taxpayers' money."  *Id*. at 725.  Whether or not the procedures were upheld or altered would not "affect the assessment or collection of taxes after the fact."  *Id*. at 725-26.

For its part, *Marcello v. Regan*, 574 F. Supp. 586 (D.R.I. 1983), was one of many cases from that period challenging the administration of the "intercept" program authorized by 26 U.S.C.

§ 6402(c), under which the IRS may divert refunds otherwise due a taxpayer to satisfy the taxpayer's past-due child support obligations. *See Rucker v. Sec'y of Treas.*, 751 F.2d 351, 355-56 (10th Cir. 1984) (collecting cases), *abrogated by Sorenson*, 475 U.S. 851. As the Court put it in *Marcello*, 574 F. Supp. at 594 (emphasis in original): "A suit to recover an intercepted refund can have no impact on either the amount of *tax* which the government will collect or on the method and manner by which the government may collect it. And, judicial intervention will not run athwart the government's need for a steady and predictable flow of tax revenues." In short, *Cohen* and *Marcello* concerned circumstances quite different from those in this case.

In addition, in an attempt to refute the idea that her suit affects tax collection, plaintiff states: "The recovery rebate is a credit against income but is not itself income." ECF 74 at 4 n.2. This is not necessarily so. For many people, it is like found money. In any event, it does not affect the implications for tax collection and revenue, as discussed above.

In sum, I conclude that the AIA applies to plaintiff's suit. Thus, the DJA also applies. *See Leckie Smokeless Coal Co.*, 99 F.3d at 583-84. This requires dismissal, unless plaintiff's case falls within one of the two relevant exceptions to the law. I turn to this issue next.

## C.

There are two narrow, judicially-crafted exceptions to the AIA. The first applies when there are no circumstances by which the Government could ultimately prevail in the suit. The second involves the question of an alternative legal way to challenge the validity of the tax. *See, e.g.*, *Cohen*, 650 F.3d at 725 n.6. Plaintiff only claims that the first of these applies. ECF 74 at 6-8. In any event, neither is applicable.

The first exception to the AIA traces to the 1962 case of *Williams Packing*, 370 U.S. 1. There, the taxpayer requested an injunction to prevent the IRS from collecting social security and

unemployment taxes.  The Supreme Court reversed a lower court's grant of injunctive relief but held that such actions could proceed, despite the AIA, if a plaintiff could show that (1) "under no circumstances could the Government ultimately prevail," and (2) "equity jurisdiction otherwise exists."  *Id*. at 7.  In analyzing the first factor, the Court explained that a court must determine, "on the basis of the information available to [the Government] at the time of the suit," whether, "under the most liberal view of the law and the facts, the United States cannot establish its claim. . . ."  *Id*. The "exception requires as one of its prerequisites that it be clear that the government 'could in no circumstances ultimately prevail on the merits.'"  *Int'l Lotto Fund*, 20 F.3d at 592 n.3 (quoting *Am. Friends Serv. Comm.*, 419 U.S. at 10).  And, the second factor means that the plaintiff must show that she would "otherwise suffer irreparable injury."  *Comm'r of Internal Revenue v. Shapiro*, 424 U.S 614, 627 (1976).

Plaintiff argues that she has met the standard for the *Williams Packing* exception. Specifically, she contends that defendants "will not ultimately prevail," noting that "this Court held Plaintiff Rueda adequately alleged § 6428(g)(1)(B) (now § 6428(g)(2)(B)) burdens her fundamental right of marriage and she has plausibly alleged § 6428(g)(1)(B) fails rational basis review."  ECF 74 at 7-8.

It is true that this Court denied the Government's Rule 12(b)(6) motion with respect to the First Amended Complaint, as to most (but not all) of the then-plaintiffs' claims.  *See* ECF 43 at 24-39.  But, even putting aside that the statute has changed and the arguments as to plaintiff's claims in the SAC thus differ, the fact that plaintiff survived a motion to dismiss hardly means that she has satisfied the *Williams Packing* exception.

As noted, the *Williams Packing* exception does not turn on whether plaintiff is more likely than not ultimately to prevail, or whether she has plausibly alleged a claim.  Rather, the first

prerequisite for the exception requires that, even "under the most liberal view of the law and the facts," "under no circumstances could the Government ultimately prevail." *Williams Packing*, 370 U.S. at 7. This is plainly not the case here. The merits of this litigation involve difficult and uncertain issues of constitutional law. The Government's arguments may (or may not) be accurate, but they are hardly frivolous.

Indeed, in *Doe*, in the Central District of California, the plaintiff brought very similar arguments as to the original version of § 6428, alleging violations of the First Amendment's speech and association protections and the Fifth Amendment's due process and equal protection guarantees. But, the District Court rejected plaintiff's arguments, first in denying a temporary restraining order, *see Doe*, 2020 WL 5076999, at *6-9, and then in granting the Government's motion to dismiss, *see Doe*, 2020 WL 5492994, at *2-7. Again, the court's conclusion in *Doe* may or may not be correct; I came to a different conclusion on certain issues in *Amador*. But, the ruling reflects that the Government has an adequate chance of prevailing, which forecloses the *Williams Packing* exception, even assuming that plaintiff can satisfy the second prong by demonstrating irreparable injury.

The Supreme Court created the second exception in *South Carolina v. Regan*, 465 U.S. 367 (1984), for situations when there is no alternative means of challenging the validity of the tax. In her Opposition, plaintiff does not invoke this exception at all, referring solely to the *Williams Packing* exception. *See* ECF 74 at 6-8. This suggests that plaintiff does not believe that she qualifies under the *Regan* exception. But, the Court has "an independent obligation to determine whether subject-matter jurisdiction exists." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).

In *Regan*, 465 U.S. at 370-72, South Carolina sought to enjoin the collection of federal taxes on the interest from state-issued bearer bonds, claiming that the tax violated the

Constitution's Tenth Amendment.  The federal government did not refute the State's constitutional arguments, instead asserting that the Anti-Injunction Act barred the suit.  The Supreme Court permitted the suit to proceed, reasoning that the AIA does not foreclose actions "where . . . Congress has not provided the plaintiff with an alternative legal way to challenge the validity of the tax." *Id*. at 373.  In the Court's view, that circumstance applied to South Carolina's suit.

Because South Carolina did not purchase the bonds, it could not avail itself of a refund suit under § 7422 to challenge the allegedly unconstitutional federal tax provision.  Thus, if the State's suit was barred by the AIA, it would have to rely on its residents to purchase the bonds, file refund suits, and then raise the State's constitutional claims.  Because it was "by no means certain that the State would be able to convince a taxpayer to raise its claims," enforcing the AIA's jurisdictional bar "would create the risk that the [AIA] would entirely deprive the State of any opportunity to obtain review of its claims." *Id*. at 380-81.

But, in the context of plaintiff's claims, Congress has provided an alternative avenue to relief: a refund suit under 26 U.S.C. § 7422.

I concluded in *Amador* that, in the context of the First Amended Complaint, § 7422 did not qualify as an "adequate remedy in a court" within the meaning of APA § 704.  ECF 43 at 12-19. But, the § 704 analysis is distinct from the *Regan* exception question of whether "Congress has . . . provided the plaintiff with an alternative legal way to challenge the validity of the tax." 465 U.S. at 373.  And, "[e]ven though [APA] § 702 waives the Government's immunity, it preserves 'other limitations on judicial review' and does not 'confer [ ] authority to grant relief if any other statute . . . expressly or impliedly forbids the relief which is sought.'" *Cohen*, 650 F.3d at 724 (quoting APA § 702); *see also, e.g.*, *Fostvedt v. United States*, 978 F.2d 1201, 1203-04 (10th Cir. 1992) (finding that "[section] 702 of the APA does not override the limitations of the

Anti–Injunction Act and the Declaratory Judgment Act"); *Larson v. United States*, 16-cv-00245, 2016 WL 7471338, at *7 n.12 (S.D.N.Y. Dec. 28, 2016) ("[Plaintiff] cannot rely upon the APA to obtain injunctive or declaratory relief that is barred by the Anti-Injunction Act or the Declaratory Judgment Act."). Indeed, as the D.C. Circuit has noted, the legislative history reflects that "§ 702 of the APA is to have no effect on limitations and prohibition of the AIA and DJA." *Cohen*, 650 F.3d at 724 (citing H.R. REP. NO. 94-1656, at 12, *reprinted in* 1976 U.S.C.C.A.N. 6121, 6132-33).

In general, Congress has provided an alternative avenue of relief to challenge the validity of a tax: 26 U.S.C. § 7422. So it is here. Plaintiff may pay her taxes, without the benefit of the $500 CARES Act credit to which she asserts she is entitled; then request a refund; and then file suit under § 7422. The constitutionality of a tax provision may plainly be challenged via suit under § 7422. *See, e.g.*, *United States v. Windsor*, 570 U.S. 744, 749 (2013) (finding the Defense of Marriage Act ("DOMA") unconstitutional in the context of a tax refund suit); *Clintwood Elkhorn*, 553 U.S. at 9-12 (discussing need to bring constitutional challenges via § 7422 process). Although, for understandable reasons, such a procedure might not be plaintiff's preferred course, this is not sufficient to invoke the *Regan* exception to the applicability of the AIA. *Cf. Johnson v. Wall*, 329 F.2d 149, 151 (4th Cir. 1964) (AIA deprives court of subject matter jurisdiction even if "the complaint alleges hardship and oppression").

Notably, "Section 7422(a) does not allow for prospective relief." *King*, 759 F.3d at 367.[18] And, many suits precluded under the Anti-Injunction Act seek prospective relief. If a limitation

---

[18] Without acknowledging this authority, the Government asserts: "A federal court plainly has the authority to find a tax statute unconstitutional and order declaratory and injunctive relief in a refund suit." ECF 73-1 at 14. For this proposition, the Government cites *Windsor*, 570 U.S. 744. Although the District Court declared DOMA unconstitutional "as applied to Plaintiff," it ordered a monetary refund, not injunctive relief. *See Windsor v. United States*, 833 F. Supp. 2d 394, 406 (S.D.N.Y. 2012), *aff'd*, 699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744.

on the availability of prospective relief were sufficient to trigger the *Regan* exception, then the exception would quickly swallow the rule and render the AIA a dead letter.  Section 7422 is a mechanism "to challenge the validity of the tax." *Regan*, 465 U.S. at 373.

Plaintiff's frustration (*see* ECF 74 at 7) over the futility of the refund administrative process—that is, that the IRS must reject plaintiff's administrative claim, rather than considering the constitutional argument—is understandable, and was relevant in the APA § 704 context.  *See* ECF 43 at 17-18.  But again, it does not provide a basis to invoke the *Regan* exception.  As the Government notes (*see* ECF 73-1 at 15), the contrary view would effectively nullify the AIA for constitutional claims.  As the Supreme Court has explained, under the AIA, "the taxpayer must succumb to an unconstitutional tax, and seek recourse only after it has been unlawfully exacted." *Clintwood Elkhorn*, 553 U.S. at 10.

In short, considering the claims in the SAC and the case law, including *CIC*, I agree with the Government that the Anti-Injunction Act and the Declaratory Judgment Act apply to plaintiff's suit, and the suit does not fall into any recognized exception to the AIA.  Therefore, the Court is without subject matter jurisdiction to consider the case.

## IV.     Conclusion

For the aforementioned reasons, I shall grant the Motion (ECF 73) and dismiss the suit for lack of subject matter jurisdiction.

An Order follows, consistent with this Memorandum Opinion.


Date: March 7, 2022                                       _____/s/_____

                                                          Ellen L. Hollander
                                                          United States District Judge